YUN HEE KIM (SBN 307459)
LAW OFFICE OF YUN HEE KIM
6060 Center Drive, Floor 10
Los Angeles, CA 90045
Phone: (213) 342-5111/Fax: (213) 419- 4959
yunhee@ykimlaw.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| R.M., a minor, by and through her guardian ad litem, M.M., | ) Case No.: |
| | ) |
| Plaintiffs, | ) Exhibit A to Complaint |
| vs. | ) |
| | ) |
| BELLFLOWER UNIFIED SCHOOL DISTRICT, a local education agency | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

Law Office of Yun Hee Kim
6060 CENTER DR. FLOOR 10
LOS ANGELES, CA 90045
TELEPHONE: (213) 342-5111 | FAX: (213) 419-4959

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

———————————————

CASE NO. 2021050128

———————————————

PARENT ON BEHALF OF STUDENT,

v.

BELLFLOWER UNIFIED SCHOOL DISTRICT.

———————————————

# DECISION

MARCH 4, 2022

On May 4, 2021, the Office of Administrative Hearings, called OAH, received a due process hearing request from Student, naming Bellflower Unified School District. On June 16, 2021, OAH granted the parties' request for continuance. On September 24, 2021, OAH granted Student's motion to amend the due process complaint. Administrative Law Judge Deborah Myers-Cregar heard this matter via videoconference on November 16, 17, and 18, and December 2, 7, 8, 14, 15, and 17, 2021, and January 18, 2022.

Yun Hee Kim, Attorney at Law, represented Student. Parent attended all hearing days on Student's behalf.

Richard Brady and Marcia Brady, Attorneys at Law, represented Bellflower Unified School District.  Matthew Adair, Director of Special Education for Bellflower Unified School District, attended all hearing days.

Lysa Saltzman, Attorney at Law, represented Orange County Department of Education, which is the service provider for Student's educational program. Sarah Bouer, Principal of Orange County Department of Education Mann Special Classes, attended all days except December 17, 2021, on behalf of Orange County Department of Education.  Christina Romanosky, director of special education for Orange County Department of Education, attended on November 16 and December 7, 8, 14, 15, and 17, 2021, and January 18, 2022.

At the parties' request the matter was continued to February 22, 2022, for written closing briefs.  The briefs were timely filed, the record was closed, and the matter was submitted on February 22, 2022.

ISSUES

At hearing, before the testimony of any witnesses, Student withdrew the issues numbered 1B and 1C in the November 9, 2021 prehearing conference order.  Those issues had alleged that the April 29, 2019 IEP, convened and held on May 29, 2019, failed to offer appropriate services, and offer measurable goals.  Student clarified the remaining issues numbered 2, 3, and 4 in the prehearing conference order.  In addition, the issues were further discussed and clarified on the first day of hearing, consistent with *J.W. v. Fresno Unified v. Fresno Unified School Dist.* (9th Cir. 2010) 626 F.3d 431, 442-443, and *Ford v. Long Beach Unified School Dist.* (9th Cir. 2002) 291 F.3d 1086, 1090. (But see *M.C. v. Antelope Valley Union High School Dist.* (9th Cir. 2017) 858 F.3d 1189,

2

1196, fn. 2 [dictum].)  Accordingly, the issues for hearing have been modified and renumbered below as stated on the record and further clarified here.

1.  Did Bellflower Unified School District deny Student a free appropriate public education, known as a FAPE, during the 2018-2019 school year and extended school year, beginning May 4, 2019, by failing to implement all parts of Student's individualized education programs, known as an IEP, when Student was unable to attend school while recovering from surgery?

2.  Did Bellflower deny Student a FAPE during the 2019-2020 school year for the COVID-19 distance learning beginning April 2020, by failing to implement all parts of Student's May 2018 and 2019 IEP?

3.  Did Bellflower deny Student a FAPE in the May 27, 2020 IEP by:

    a.  Failing to provide sufficient information regarding Student's present levels of performance;

    b.  Failing to offer measurable goals;

    c.  Failing to offer appropriate goals; and

    d.  Failing to offer appropriate in-person services at home?

4.  Did Bellflower deny Student a FAPE during the 2020-2021 school year, by failing to implement all parts of Student's IEP, including when in-person learning reopened, but Student could not medically attend due to not being vaccinated against COVID-19?

5.  Did Bellflower deny Student a FAPE in the May 10, 2021 IEP by:

    a.  Failing to provide sufficient information regarding Student's present levels of performance;

    b.  Failing to offer measurable goals

    c.  Failing to offer appropriate goals; and

    d.  Failing to offer appropriate in-person services at home?

3

6. Did Bellflower deny Student a FAPE during the 2021-2022 school year, up to September 24, 2021, by failing to implement Student's May 10, 2021 IEP, by not providing transportation that included a one-to-one aide, a wheelchair van, and a driver?

## JURISDICTION

This hearing was held under the Individuals with Disabilities Education Act, its regulations, and California statutes and regulations.  (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006) et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.) The main purposes of the Individuals with Disabilities Education Act, referred to as the IDEA, are to ensure:

- all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living, and

- the rights of children with disabilities and their parents are protected.  (20 U.S.C. § 1400(d)(1); see Ed. Code, § 56000, subd. (a).)

The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, assessment, or educational placement of the child, or the provision of a free appropriate public education, referred to as FAPE, to the child.  (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, and 56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents, and has the burden of proof by a preponderance of the evidence.  (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i);

4

*Schaffer v. Weast* (2005) 546 U.S. 49, 57-58, 62 [126 S.Ct. 528, 163 L.Ed.2d 387]; and see 20 U.S.C. § 1415(i)(2)(C)(iii).)  Here, Student bears the burden of proof.  The factual statements in this Decision constitute the written findings of fact required by the IDEA and state law.  (20 U.S.C. § 1415(h)(4); Ed. Code, § 56505, subd. (e)(5).)

Student was 15 years old and in ninth grade at the time of hearing.  Student resided within Bellflower Unified School District's geographic boundaries at all relevant times.  Bellflower Unified School District is within Los Angeles County.  Orange County Department of Education, part of the North Orange County Special Education Local Plan Area, known as SELPA, administered Student's elementary school program at Mann Special Classes through eighth grade, and Student's high school program at Trident Special Classes.  Student followed the school calendar for Orange County Department of Education.

Student was eligible for special education under the categories of multiple disabilities and visual impairment, which is a low-incidence disability.

Student's most recent triennial assessment in 2018 demonstrated Student had a cognitive level between birth to 7-months-old, and a developmental level between one- and four-months old.  Student had cerebral palsy, seizure disorder, speech-impairment, developmental delay, precocious puberty, left spastic hip dislocation that required surgery, quadriparesis secondary to cerebral palsy, optic nerve atrophy, high astigmatism, strabismus, and legal blindness.  She was nonverbal, non-ambulatory, and required full adult assistance to meet her daily living and medical needs.  She used adaptive equipment and braces for standing and weight-bearing activities.  She could sit in her wheelchair and operate a switch with her head.  She was fed through a gastronomy tube and was learning to tolerate pureed food in her mouth.

Student's claims were limited to the period between May 4, 2019, two-years before Student filed her original complaint with OAH, and September 24, 2021, the date Student filed her amended complaint.

ISSUE 1:  DID BELLFLOWER UNIFIED SCHOOL DISTRICT DENY STUDENT A FAPE DURING THE 2018-2019 SCHOOL YEAR AND EXTENDED SCHOOL YEAR, BEGINNING MAY 4, 2019, BY FAILING TO IMPLEMENT ALL PARTS OF STUDENT'S IEPS WHEN STUDENT WAS UNABLE TO ATTEND SCHOOL WHILE RECOVERING FROM SURGERY?

While Student in one respect articulated Issue 1 as concerning Bellflower's failure to implement her IEP when she was recovering from hip surgery at home, the factual and legal description in Student's amended complaint, proposed issue statement filed on the day of hearing, and her written closing brief allege Bellflower did not review and revise her IEP when she was unable to receive her special education and related services in an on-campus classroom after she had hip surgery in March 2019.  Student alleges Bellflower should have revised her IEP and offered home hospital instruction with specialized academic instruction, language and speech therapy, occupational therapy, physical therapy, specialized vision services, adapted physical education, intensive individual services, and health and nursing services that were things other than specialized health care services, in her home during her recovery.

Bellflower asserts it was not required to implement Student's IEP when it did not have a doctor's statement that she was in physical condition to benefit from instruction at home.  Bellflower further alleges Parent did not want Student to attend school until she was medically cleared and stable, which occurred in August 2019.  Finally, Bellflower asserts Parent knew about the option of home-hospital instruction, did not request it,

6

and would not have consented to a change of placement for fear of losing Student's seat at Orange County Department of Education's all-inclusive special education campus, Mann Special Classes.

A FAPE means special education and related services that are available to an eligible child that meets state educational standards at no charge to the parent or guardian.  (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.)  Parents and school personnel develop an IEP for an eligible student based upon state law and the IDEA.  (20 U.S.C. §§ 1401(14), 1414(d)(1); and see Ed. Code, §§ 56031,56032, 56341, 56345, subd. (a) and 56363 subd. (a); 34 C.F.R. §§ 300.320, 300.321 and 300.501.)

In general, a child eligible for special education must be provided access to specialized instruction and related services that are individually designed to provide educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.  (*Board of Education of the Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201-204, [102 S. Ct. 3034] (*Rowley)*; *Endrew F. v. Douglas County School Dist. RE-1* (2017) 580 U.S. __ [137 S.Ct. 988, 1000] (*Endrew F.*).)

Whether a student was offered or denied a FAPE is determined by looking at what was reasonable at the time the IEP was developed, not in hindsight.  (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149, (*Adams*), citing *Furhman v. East Hanover Board of Educ.* (3d Cir. 1993) 993 F.2d 1031, 1041.)  This is known as the "snapshot rule."

A school district violates the IDEA if it materially fails to implement a child's IEP. The failure to implement the IEP is "material" when the services provided to a disabled child fall "significantly short of the services required by the child's IEP."  (*Van Duyn v.*

*Baker School Dist. 5J* (9th Cir. 2007) 502 F.3d 811, 822 (*Van Duyn*).)  No statutory requirement of perfect adherence to the IEP exists, nor is there any reason rooted in the statutory text to view minor implementation failures as denials of a FAPE.  (*Id.* at p. 821.) "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP."  (*Id.* at p. 815.)

The IDEA seeks to ensure that disabled students are educated to the maximum extent appropriate with nondisabled peers, and separate schooling is disfavored unless the nature or severity of the disability cannot be satisfactorily accommodated in a less restrictive environment.  Therefore, it is unsurprising that California regulations implementing the IDEA require that a pupil with exceptional needs not be sequestered in a home placement unless certain stringent criteria are met.

When a pupil with exceptional needs experiences an acute health problem which results in non-attendance at school for more than five consecutive days, the school district shall inform the holder of the educational rights of the availability of individual instruction to be delivered in the pupil's home, in a hospital, or in other residential health facilities, other than a state hospital.  The school district shall assure that an IEP team meeting is convened to determine appropriate educational services.  (Ed. Code, § 48206.3; Cal. Code Regs., tit. 5, § 3051.17, subd. (c).)

Title 5, California Code of Regulations, section 3051.4, describes the circumstances under which a child should be offered home/hospital instruction by a school district.  Generally, home/hospital instruction is limited to pupils with exceptional needs resulting from a medical condition related to surgery, accidents, short-term illness, or medical treatment required for a chronic illness.

In determining placement, school districts must ensure, to the maximum extent appropriate: that children with disabilities are educated with non-disabled peers; and that special classes or separate schooling occur only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.  (20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114 (a); Ed. Code, § 56031.)  The continuum of program options available for special education students includes all, or any combination, of the following, in increasing order of restrictiveness:

1.  regular education programs;
2.  a resource specialist program;
3.  designated instructional services;
4.  special day classes;
5.  nonpublic, nonsectarian school services;
6.  state special schools;
7.  instruction in nonclassroom settings;
8.  itinerant instruction;
9.  instruction using telecommunication, and *instruction in the home, in hospitals,* and in other institutions.

(34 C.F.R. § 300.115 (emphasis added); Ed. Code §§ 56360, 56361.)  In-home placement is one of the most restrictive placements.

Instruction in the home or hospital setting is only provided when the student's IEP team recommends the instruction or services.  (Cal. Code Regs., tit. 5, § 3051.4, subd.  (a).)  The instruction may be delivered individually, in small groups, or by teleclass. (Cal. Code Regs., tit. 5, § 3051.4, subd. (b).)  The IEP team shall review, and revise if appropriate, the IEP whenever there is a significant change in the pupil's current medical

9

condition.  (Cal. Code Regs., tit. 5, § 3051.4, subd. (c).)  The IEP team's decision to recommend placement for home instruction shall be supported by an assessment and medical report from the attending physician and surgeon.  The medical report must state and diagnose the condition and certify the severity of the condition that prevents the pupil from attending a less restrictive placement.  The report must include a projected calendar date for the student's return to school.  (Cal. Code Regs., tit. 5, § 3051.4, subd. (d).)

To provide a student a FAPE, a school district must deliver special education and related services "in conformity with" the student's IEP.  (20 U.S.C. § 1401(9)(D).)  "IEPs are clearly binding under the IDEA, and the proper course for a school that wishes to make material changes to an IEP is to reconvene the IEP team pursuant to the statute – not to decide on its own no longer to implement part or all of the IEP."  (*Van Duyn, supra*, 502 F.3d 811)

A procedural violation of FAPE results in liability only if the violation impeded the child's right to a FAPE, significantly impeded the parent's opportunity to participate in the decision-making process; or caused a deprivation of educational benefits.  (20 U.S.C. § 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2); see *W.G. v Board of Trustees of Target Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.)

## FAILURE TO IMPLEMENT THE IEPS AS WRITTEN

Student's claims in Issue 1 are limited to the period between May 4, 2019, two years before Student filed her complaint with OAH, through August 2, 2019, the last day of the extended school year session.

While Student alleged in the heading of her complaint that Bellflower failed to implement her IEP, the body of the complaint, proposed issue statement and closing

10

brief alleges Bellflower did not offer the same services to Student in a different environment by failing to hold an IEP and offer home hospital instruction.  Student provided no legal authority to support the allegation that Bellflower was required to implement Student's IEPs as written when she was unable to attend school due to recovery from hip surgery.  However, because Student raised the issue of whether Bellflower denied Student a FAPE for failing to implement her IEPs as written, it is discussed below.  Bellflower defended this issue at hearing and in written closing briefs. (*M.C. v. Antelope Valley Union High School Dist.*, *supra*, 858 F.3d at p. 1196, fn. 2 [dictum].)

Both Student's operative May 1, 2018 and May 29, 2019 IEPs provided for nearly identical placement and related services at Mann Special Classes, and the May 29, 2019 IEP changed adapted physical education service from a consultation service to a direct service:

- placement at Mann Special Classes specialized academic instruction, 360 minutes per day;
- language and speech therapy, 30 minutes per week individually; and 30 minutes per week in a group;
- occupational therapy consultation, 60 minutes per month;
- physical therapy twice weekly totaling 40 minutes per week;
- health and nursing specialized physical health care services, 270 minutes per day, and health and nursing services other than health and nursing specialized physical health care services, consultation 60 minutes per year;
- specialized vision services, consultation, two 15-minute sessions per month;
- a one-to-one aide, 360 minutes per day;

- adapted physical education services increased from 15 minutes monthly of consultation with California Children's Services, to a direct service 30 minutes per week;
- transportation; and
- extended school year services.

Student's placement at Orange County Department of Education's Mann Special Classes provided a comprehensive program embedded with full-time, on-site specialists and service providers, including one registered nurse and two licensed vocational nurses.  The nurses were highly qualified and skilled and were knowledgeable about Student.  The nurses meticulously followed Student's doctors' orders for seizure control, medication, gastronomy tube clearing and feeding, repositioning Student every hour, and transferring her in and out of walker or gait trainers, standers, and activity tables.  The nurses trained classroom staff and service providers and worked as a team to safely implement Student's IEPs.

On January 18, 2019, Parent spoke to the school nurse informing her that Student was unable to use her stander or be transferred into her wheelchair and sit without screaming in pain when her legs were moved.  Parent reported Student would undergo surgery on her hip, and that Student's doctor would send a medical note to the school nurse prohibiting Student from standing in her walker or participating in weight-bearing activities until after she had an upcoming surgery on her hip.  However, the record did not establish that the note was received.  On January 25, 2019, Parent reported to the school nurse that Student's hip surgery was scheduled for March 7, 2019.  On February 28, 2019, Student attended her last day of school.

On March 7, 2019, Student had surgery removing the ball of her hip.  Bellflower monitored Student's recovery and attempted to hold an annual IEP team meeting on

April 29, 2019, but it was postponed to May 29, 2019 at Parent's request, due to Student's post-surgical complications. Although Student was expected back to school earlier, Student did not return to school until the following school year. Student did not have a medical release from her doctor to participate in any specialized academic instruction or related services that required such physical movement. By August 13, 2019, Student's doctor provided a concise medical report allowing Student to return to school, but she was not medically cleared to stand upright, an activity that was part of her goals. Student was cleared to resume physical therapy, but not weight-bearing activities. Student was cleared to use her hip in passive as well as active range of motion functions. Student was permitted to use her Hoyer lift if available and to wear her ankle foot orthosis, known as AFO braces, during the day, as tolerated. Student returned to school on August 29, 2019, the beginning of the 2020-2021 school year.

Here, Bellflower did not implement Student's May 1, 2018 and May 29, 2019 IEPs as written, from May 4 to August 2, 2019, the end of the extended school year, because Student could not attend Mann Special Classes. Bellflower did not have medical clearance from Student's surgeon and parental consent for Student to return to school. Student did not establish Bellflower failed to implement the IEPs as written, because it had no medical clearance to do so in the school setting.

On January 18, 2019, Bellflower received verbal notice from Parent informing them Student could not attend their program at Mann Special Classes, and that a medical note from Student's doctor would be faxed. Bellflower did not receive a medical note allowing her to return to school, and even then with restrictions, until August 13, 2019, just before the new school year began. Therefore, based on Student's circumstances, it was not possible for Bellflower to deliver the program and implement the IEPs as written. Further, Student did not enroll in and attend the summer session

13

from July 8 through August 2, 2019, due to a pre-planned family vacation.  Student did not meet the burden of proof that Bellflower denied her a FAPE during this time period because she did not consent to, and elected for non-medical reasons, not to attend the extended school year program.

Student's academic program was predominantly a movement-based program, not an academic skills program.  Student had difficulty holding her head upright and could not independently move her body without assistance.  She worked with her physical therapist, occupational therapist, and adapted physical education specialist to further develop her physical movement.  Student's gross motor goals required her to use a gait trainer with supports and use a prone stander for up to 20 minutes per session.  Student's goals also required her to be re-positioned and moved onto the floor to stretch and recline with her sidelyer.  Student's vocational goal was to sit in an upright position and look at an activity or item and engage it without bringing her hands to her face.

Parent postponed the scheduled April 29, 2019 annual IEP team meeting to May 29, 2019.  During the May 29, 2019 IEP team meeting, convened after Student's March 7, 2019 surgery, Parent actively participated in updating the IEP team about Student's post-surgical complications.  Parent reported and the IEP team was aware Student's surgical wound remained open at the hip and groin, Student cried in pain during transfers into and out of her wheelchair, and Student spent most of her time in bed.  Parent believed Student could not physically tolerate an educational program until she healed.  Student had nursing services at home eight hours per day, funded by California Children's Services, called CCS.  Student's occupational and physical therapy with CCS were stopped while she recovered.  The IEP team discussed a return date of June 11, 2019, but Parent did not consent to that date.

14

Based upon what Bellflower knew at the time, Student was physically unable to benefit from her educational program until she recovered medically.  Student's goals required sitting in an upright position in a wheelchair or activity chair, using a head switch, looking at a book, using a gait trainer to stand and move her legs, and following one-step directions.  Student's complications from surgery prevented her from being transferred into her wheelchair or activity table, sitting upright, using a gait trainer, and operating a computer switch with her head.  Student had a low level of activity and movement and could not participate in her educational program with open wounds from hip surgery, which caused her severe pain when she was moved and repositioned.

Bellflower had no medical orders allowing Student to participate in a school-based program.  Bellflower was required to follow Student's doctor's medical and post-surgical orders.  Student was medically unable to work on her goals.  Student did not have a medical release to return to the classroom.  Student was not allowed to stand in her walker or participate in weight-bearing activities.  Student was not medically cleared by her doctor to return to school, and even then with restrictions, until August 13, 2019.

Student did not meet her burden of proof and failed to establish Bellflower denied her a FAPE by failing to implement her IEP, from May 4, 2019 to August 2, 2019, the end of the extended school year.

STUDENT'S UNTIMELY CHALLENGE TO BELLFLOWER'S FAILURE TO GIVE NOTICE OF HOME HOSPITAL INSTRUCTION AVAILABILITY AND HOLD IEP TEAM MEETING TO REVIEW AND REVISE STUDENT'S PLACEMENT AND SERVICES, AND OFFER HOME HOSPITAL INSTRUCTION DURING SURGERY RECOVERY

Student complained on May 4, 2019, that Bellflower denied Student a FAPE by not giving Parent notice about the availability of individual instruction to be delivered in Student's home or hospital and convene an IEP team meeting to determine appropriate educational services for Student when she was not able to attend school for more than five consecutive school days due to her physical limitations after hip surgery.

Under the "snapshot rule," whether a student was offered or denied a FAPE is determined by looking at what was reasonable at the time the IEP was developed, not in hindsight.  (*Adams, supra,* 195 F.3d at p. 1149.)

Changing the location once student receives special education and related services based upon that individual's temporary medical needs from a classroom to home hospital instruction is a change of placement and service providers, which requires an IEP team decision supported by medical reports detailing the medical diagnosis and reasons why the student required such a restrictive educational placement.

A parent is required to request a due process hearing within two years of the date the parent knew or should have known about the alleged action that forms the basis of the complaint, or in such time as the State law allows.  (20 U.S.C. § 1415(f)(3)(C).) In California, a request for a due process hearing "shall be filed within two years from the date the party initiating the request knew or had reason to know of the facts

16

underlying the basis for the request." (Ed. Code, § 56505, subd. (l).)  The two-year statute of limitations period does not apply to a parent if the parent was prevented from requesting the due process hearing due to either:

1. specific misrepresentations by the local educational agency that it had solved the problem forming the basis of the due process hearing request; or
2. the withholding of information by the local educational agency from the parent that was required to be provided to the parent under special education law.  (*Ibid*; 20 U.S.C. § 1415(f)(3)(C)(D).)

For purposes of the statute of limitations, California's discovery rule is consistent with the IDEA.  In California, a claim accrues when a parent learns of the underlying facts that form a basis for the action.  (Ed. Code, § 56505, subd. (*l*).)  A parent's knowledge that a student's education is inadequate is sufficient for the statute of limitations to begin to accrue.  (*M.M. & E.M. v. Lafayette School District.* (N.D.Cal., Feb. 7, 2012, Nos. CV 09– 4624, 10–04223 SI) 2012 WL 398773, at pp.**17–19 (*M.M.*), affd. in part & revd. in part (9th Cir. 2014) 767 F.3d 842, 858-859; see also *M.D. v. Southington Board ofEduc.* (2d Cir. 2003) 334 F.3d 217, 221.)  The statute of limitations begins to run when a party is aware of the underlying facts that would support a legal claim, not when a party learns that the action was wrong.  (*M.M., supra,* 2012 WL 398773 at p. *18; see also *Bell v. Board. of Education of the Albuquerque Public Schools* (D.N.M. 2008) 2008 WL 4104070, at p.*17; *Avila v. Spokane School District 81* (9th Cir. 2017) 852 F.3d 936, 937, 945 [the IDEA's statute of limitations barred claims that were filed more than two years after the time parents "knew or should have known" about the actions forming the basis for their complaint].)  Congress did not intend to authorize the filing of claims under the IDEA many years after the alleged wrongdoing occurred.  (*Alexopulous v. San Francisco Unified School District* (9th Cir. 1987) 817 F.2d 551, 555.)

The federal District Court for the Eastern District of California upheld OAH's determination that parents' claim was time-barred when parents argued that they were unaware of how far below grade level student was performing until shortly before filing their complaint.   (*Fernandez v. Elk Grove Unified School District*, E.D.Cal., March 31, 2020, No. 2:19-cv-00082-MCE-AC) 2020 WL 1532229.)  (*Fernandez*).)  *Fernandez* emphasized that for accrual purposes, it did not matter if parents understood that they had a particular legal claim; rather, what mattered was that parents had knowledge of student's performance more than two years prior to the filing of the complaint. Specifically, the District Court concluded that parents demonstrated they knew, or should have known, "the problem which formed the basis of the action" by their communications with the IEP team annually about student's subpar progress more than two years before they filed student's claims. (*Id.* at **4-5.)

The IDEA requires that school districts establish and maintain procedures to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of FAPE by such agencies.  (20 U.S.C. § 1415(a).) A copy of the notice of a parent's or guardian's rights shall be attached to the assessment plan.  A written explanation of all the procedural safeguards under the IDEA shall be included in the notice of a parent's or guardian's rights.  (Ed. Code, § 56321, subd. (a).)  A copy of the procedural safeguards must be given by a school district to a particular parent of a child with a disability a minimum of once a year, except that a copy shall be given to the parents:

1.  upon initial referral for assessment or parent request for assessment;

2.  upon filing a request for a due process hearing;

3.  in accordance with certain discipline procedures; or

4. upon parent request. (20 U.S.C. § 1415(d)(1)(A); 34 C.F.R. § 300.504(a); Ed. Code, § 56301, subd. (d)(2).)

Thus, where the evidence shows that the parents were fully aware of their procedural options, they cannot excuse a late filing by pointing to the school's failure to formally notify them of those options. (*D.K. v. Abington School District* (3d Cir. 2012) 696 F.3d233, 246-247.)

Special education law does not recognize the doctrine of continuing violations as an exception to the two-year statute of limitations. (20 U.S.C. § § 1415(b)(6)(B), (f)(3)(D); see also *E.F. v. Newport Mesa Unified School District* (C.D.Cal., June 23, 2015, No. SACV 14-00455-CJC (RNBx) 2015 WL 3867982, * 8, fn. 6, affd. on remand *E.F. by and through Fulsang v. Newport Mesa Unified School District* (9th Cir. 2018) 726 Fed.Appx. 535; *J.L. v. Ambridge Area School District* (W.D.Pa. 2008) 622 F.Supp.2d 257, 268-269 [finding that IDEA claims are not tolled under a continuing violation theory as the two exceptions specifically set forth in the statute are the exclusive exceptions to the statute of limitations.]) A parent may not file a due process complaint challenging the appropriateness of an IEP that was created outside the statute of limitations, even though the IEP was in effect within the statute of limitations. (*K.P., etc., v. Salinas Union High School District* (N.D.Cal., April 8, 2016 No. 5:08-cv-03076-HRL) 2016 WL 1394377, **10-11 [student could not challenge development of IEP in effect outside two-year statute of limitations].

Here, Bellflower and Parent knew about Student's impending surgery on January 18, 2019. On February 1, 2019, Parent signed authorizations for Bellflower to speak with Student's doctors, including her orthopedist at Miller's Children's Hospital. On February 25, 2019, Bellflower updated Student's Individualized Health Care Plan for seizures. Student's last day of school was February 28, 2019. On March 7, 2019, Student

had her hip surgery.  Both Bellflower and Parent knew, as of some date between January 18 and March 7, 2019, that Student would be unable to return to school within five consecutive days after her surgery.

Bellflower timely scheduled an annual IEP team meeting for April 29, 2019, but Parent postponed it to May 29, 2019 because of Student's prolonged recovery after surgery.  The May 29, 2019 IEP team meeting was held as an annual review.  The IEP team reviewed Student's present levels of performance and developed goals for the classroom.  However, the IEP team did not discuss a possible change of placement to home hospital during Student's projected medical absence.

Between January 18 and March 7, 2019, Bellflower had knowledge of significant changes in Student's current medical condition.  That prolonged, medically necessary absence triggered an obligation to notify Parent about the availability of home hospital instruction as a possible placement option at an IEP team meeting.  Bellflower did not convene an IEP team meeting to determine appropriate educational services for Student, as required.  The IEP team should have reviewed, and revised if appropriate, Student's IEP based on a significant change in her current medical condition.  (Ed. Code, § 48206.3; Cal. Code Regs., title 5, § 3051.17, subd. (c).)  Bellflower was required to review and revise, if appropriate, any changes and any reduction in services during the IEP team meeting.  (Cal. Code Regs., tit. 5, § 3051.4, subd. (c).)  While Bellflower reviewed and revised Student's IEP at the annual IEP team meeting on May 29, 2019, it failed to discuss any changes and reduction of services that might have been necessary due to Student's inability to attend school for more than five consecutive school days due to her physical limitations after hip surgery.

However, Bellflower's obligation to do so arose between January 18 and March 7, 2019, or within a very short period after March 7, 2019, such as the sixth

consecutive school day after that date.  Parent knew of significant changes in Student's medical condition during this time.  Student's claim accrued when Parent learned of the underlying factsthat formed a basis for this action, specifically, the fact that Student was unable to attend school for more than five consecutive school days after her surgery. (Ed. Code, § 56505, subd. (*l*).)  Parent failed to request a due process hearing "within two years from the date she knew or had reason to know of the facts underlying the basis for the request."  (Ed. Code, § 56505, subd. (*l*).)  Parent did not file her due process complaint until May 4, 2021, more than two years after these events occurred.

Parent did not establish she met the criteria granting exceptions to the two-year statute of limitations allowed under title 20 United States Code section 1415(f)(3)(C)(D). Parent did not establish Bellflower made specific misrepresentations that it had solved the problem forming the basis of the due process hearing request.  Nor did Parent establish Bellflower withheld information from her it was required to provide, which prevented her from requesting a due process hearing.

The statute of limitations begins to run when a party is aware of the underlying facts that would support a legal claim, not when a party learns that the action was wrong.  (*M.M., supra,* 2012 WL 398773 at p. *18.)  Therefore, Student was required to file her complaint on this issue no later than March 7, 2021, or within a very short period after March 7, 2021, such as the sixth consecutive school day after that date, and failed to do so.

Student remained out of school from February 28 through August 29, 2019. There were no additional factors that triggered a renewed obligation to hold an IEP team meeting to review and revise Student's IEPs.  Student's continued absence and her difficulty healing from surgery is a continuation of her original claim.  Special education law does not recognize the doctrine of continuing violations as an exception to the

two-year statute of limitations.  (20 U.S.C. § 1415(b)(6)(B), (f)(3)(D).  Therefore, Student's claim that Bellflower denied her a FAPE by failing to give Parent notice about the availability of individual instruction to be delivered in Student's home or hospital and convene an IEP team meeting to determine appropriate educational services for Student when she was not able to attend school for more than five consecutive school days due to her physical limitations after hip surgery is untimely and barred by the two-year statute of limitations.

ISSUE 2:  DID BELLFLOWER DENY STUDENT A FAPE DURING THE 2019-2020 SCHOOL YEAR SCHOOL YEAR FOR COVID DISTANCE LEARNING BEGINNING APRIL 2020, BY FAILING TO IMPLEMENT ALL PARTS OF STUDENT'S MAY 2019 IEP?

Student alleges Bellflower failed to implement some parts of Student's May 2019 IEP in the areas of occupational therapy, health and nursing specialized physical health care services, specialized vision services, adapted physical education, and intensive individual services.  Student alleges Parent was not given the tools she needed to support Student's educational program at home during the campus closure due to the COVID-19 pandemic.

Bellflower asserts COVID-19 pandemic school closures and public health and safety orders prevented it from implementing Student's IEP in the classroom, and from providing direct services in person.

On March 4, 2020, Governor Gavin Newsom declared a state of emergency in the State of California due to the rapid spread of a highly contagious airborne coronavirus that could lead to death, designated COVID-19, a global health and safety risk.

On March 12, 2020, the U.S. Department of Education, called the US DOE, the agency responsible for developing regulations for and enforcement of the IDEA, outlined the States' responsibility under the IDEA to children with disabilities during the COVID-19 outbreak.  (Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak (U.S. Dept. of Education, March 2020).)  When an agency interprets its own regulations, a very deferential standard applies, and such an interpretation is controlling unless plainly erroneous or inconsistent with the regulation.  (*Federal Express Corp. v. Holowecki* (2008) 552 U.S. 389, 397; *Auer v. Robbins* (1977) 519 U.S. 452, 461 [agency commentary explaining final rule and published with the rule in the Federal Register is entitled to deference].)

The US DOE advised that if a school district closed its schools to slow or stop the spread of COVID-19 and did not provide educational services to the general student population, it was not required to provide services to students with disabilities during that same period of time. *(Id*., at p. 2, Answer A-1.)  If educational opportunities were provided to the general population during a school closure, then the school district would need to ensure that students with disabilities received a FAPE at that time.  (*Ibid*.) The US DOE instructed school districts to determine if each child with disabilities could benefit from online or virtual instruction, instructional telephone calls, and other curriculum-based instructional activities.  However, it cautioned that in doing so, school personnel should follow appropriate health guidelines to assess and address the risk of COVID-19 transmission in the provision of services.  *(Id*., at pp. 3-4, Answer A-3.)

On March 13, 2020, California Governor Gavin Newsom issued Executive Order N-26-20, which allowed continued funding to schools that closed their school buildings in response to COVID-19.  It directed the California Department of Education, also called CDE, to issue guidance on how to ensure students with disabilities received a FAPE

consistent with their IEP and how to meet other procedural requirements under the IDEA and California law.  On March 19, 2020, Governor Newsom issued Executive Order N-33-20, directing all Californians to stay home except to go to an essential job or to shop for essential needs, and to practice social distancing from others.

On March 20, 2020, CDE published guidance on school closures and the provision of special education during the COVID-19 pandemic.  (CDE, Special Education Guidance for COVID-19, COVID-19 School Closures and Services to Students with Disabilities (March 20, 2020) (CDE March 20, 2020 Guidance).)  Noting the federal government had not waived any existing IDEA requirements, CDE advised local educational agencies to "do their best in adhering to IDEA requirements . . . to the maximum extent possible," "[u]ntil and unless [the US DOE] ultimately provides flexibilities under federal law."  CDE encouraged local educational agencies to "consider ways to use distance technology to meet these obligations."  (*Ibid*.)

On March 21, 2020, the US DOE issued supplemental guidance, which stated school districts must provide a FAPE to students with disabilities during the COVID-19 pandemic, but expressly recognized that education and related services and supports might need to be different in a time of unprecedented national emergency. (Supplemental Fact Sheet Addressing the Risk of COVID-19 in Preschool, Elementary and Secondary Schools While Serving Children with Disabilities (March 21, 2020, Office of Civil Rights and OSEP) at p. 2.)  It stated FAPE may include, as appropriate, services provided through distance instruction provided virtually, online, or telephonically.  (*Id*., at pp. 1-2.)  The US DOE emphasized that the IDEA allowed for flexibility in determining how to meet the individual needs of students with disabilities.  (*Id*., at p. 2.)  If there were inevitable delays in providing services, it directed IEP teams to make individualized

determinations of whether and to what extent compensatory services were due when schools resumed normal operation.  (*Ibid*.)

When a school district does not perform exactly as called for by the IEP, the district does not violate the IDEA unless it is shown to have materially failed to implement the child's IEP.  (*Van Duyn, supra,* 502 F.3d 811, 815, 822.)  '[t]he materiality standard does not require that the child suffer demonstrable educational harm in order to prevail."  (*Ibid.*) *Van Duyn* also noted that a child's educational progress, or lack of it, might be one indicator of whether a discrepancy in services was material.  Presenting the example of a child not provided the reading instruction called for in their IEP, the court noted, "*a shortfall in the child's reading achievement would certainly tend to show that the failure to implement the IEP was material.   On the other hand, if the child performed at or above the anticipated level, that would tend to show that the shortfall in instruction was not material.*"  (*Ibid.*, emphasis added.)

In *N.D. v. Hawaii Dept. of Education* (9th Cir. 2010) 600 F.3d 1104, in which the court held a one-day per week shutdown of public schools statewide to address a fiscal crisis did not constitute a change of placement for special education students, it suggested in dicta that the student's claim was "more properly characterized as a 'material failure to implement the IEP.'" (*Id*. at p. 1117, citing *Van Duyn*, *supra,* 502 F.3d. at p. 822.)  The court explained, "A school district's failure to provide the number of minutes and type of instruction guaranteed in an IEP could support a claim of material failure to implement an IEP."   (*Ibid*.)

EMERGENCY CLOSURES AND THE INSTRUCTION INTERRUPTION –
MARCH 16,  2020 TO MARCH 31, 2020.

Orange County Department of Education closed its school sites on March 16,
2020 to prevent the spread of COVID-19, after consultation with the Orange County
Health Care Agency, the California Department of Public Health, the California
Department of Education, and the Centers for Disease Control and Prevention.

Bellflower was not required to implement Student's IEP while it closed instruction
for all students during COVID-19 emergency closures from March 16,  2020 to
March 31, 2020.

On March 23 and 25,  2020, Orange County Department of Education sent a prior
written notice letter explaining it would continue to provide special education and
related services as indicated in the last agreed-upon IEP, to the greatest extent possible,
but delivered in an alternative manner through distance learning.  Students teacher
contacted Parent that week to make sure she had access to electronic devices and
Internet connections, and to discuss the emergency distance learning plan, which would
start the following week.

Student conceded that she is not challenging the emergency closures beginning
March 16, 2020, when all schools were closed to slow or stop the spread of COVID-19,
when no educational services were provided to the general student population and the
special education student population during the same period.

VIRTUAL PROGRAM APRIL 1, TO JUNE 16, 2020 DID NOT PROVIDE FAPE

Bellflower did not implement Student's IEP on campus and in person because
schools were ordered to shut down and in-person services were prohibited by health

26

and safety orders, due to the high risk of viral transmission.  Bellflower did not know when schools would reopen.  Mann Special Classes remained closed from March 16, 2020 though end of school year, June 16, 2020.  By April 1, 2020, virtual instruction classes started.  When Orange County Department of Education closed for spring break April 6 through 10, 2020, Bellflower was not required to implement Student's IEP.

Student required in-person services to meaningfully access her educational program.  Student's multiple disabilities included vision impairment, orthopedic impairment, seizure activity, cerebral palsy, and low physical and cognitive skills. Student required in-person services because she needed adult assistance for safety and assistance with transitioning and standing, hand over hand prompting, and nursing services throughout her day so she could work on her goals.  However, Mann Special Classes remained closed from March 16, 2020 though end of school year, June 16, 2020.

Student had two operative IEPs during this time frame, the May 2019 IEP, and the May 2020 IEP, which became operative on June 11, 2020 when Parent consented.  The IEP offer of placement, instruction and services were based upon an in-person classroom model at the Mann Special Classes.  No changes were made to the service models or service hours.

Beginning April 1, 2020, two weeks after the lockdown, Bellflower delivered virtual instruction.  The academic instruction hours were reduced, but the related services remained the same.

Jessica Lopez, Student's teacher, described how she set up her Google Classroom and taught via remote instruction through Zoom.  She posted schedules of Zoom classroom instructions and therapies, which Parent could print out.  She emailed Parent

the link to join her Zoom classroom, but it was up to Parent to join the sessions.  Parent was also able to access activities that the therapists uploaded in Lopez' Zoom classroom page.

Lopez taught daily Zoom classroom sessions for her students, five days a week. Lopez recalled that Parent and Student signed on approximately two times a week out of five weekly sessions.  Student rarely participated in Zoom meetings for class, group therapies, group speech, because she was usually sleeping during the Zoom session and not awake.

Lopez sent manipulatives home including visual aids with groupings of numbers, days of the week, and song choices.  Student's stander and gait trainer were offered to Parent on May 27, 2020, but Parent declined.  Student's head switch was not sent home and Lopez did not work on Student's functional academic goal to operate the switch. Lopez worked on a general reading goal during the group sessions but did not work on Student's goal individually because she could not bring the image into Student's visual field to look at the story.  Lopez' inability to work on those goals meant Student would not likely make progress in those areas.

Bellflower was not able to provide virtual health care.  Student required in-person individual specialized health care, assisted feeding and toileting care, transferring into wheelchairs and standers, positioning, medication implementation and seizure care. CCS provided Student a home nurse eight hours per day, to help with Student's medical needs.

Bellflower provided virtual speech therapy.  Student required in-person speech therapy.  Student was working on receptive language listening to the sounds of words and language being used and following one-step directions.  Although the speech therapist provided weekly individual and group virtual services during the emergency

28

closures, the multisensory approach used in the classroom was required for Student. Student did not have access to voice output switch, and did not have the ability to take turns with her peers in-person during group speech sessions.  At home, Student adapted to blinking once for "yes" and biting on a spoon when she did not want to eat something.

Bellflower was not able to provide a virtual one-to-one aide for transferring Student from her wheelchair to her gait trainer, activity chair, and floor-based exercises. Student required a one-to-one aide to help reposition her and to transfer her from sitting to standing.  Student also needed help with placing objects in front of her field of vision.

Bellflower provided virtual occupational therapy consultation, which did not need to be in person.  The Zoom consultations that the occupational therapist provided directly to Parent and Student's nurse, while Student was present, trained them on occupational therapy exercises.

Bellflower provided virtual specialized vision consultation.  Student's specialized vision care did not need to be in person.  The service was a consultation with Parent.

Bellflower provided virtual physical education.  However, Student's adapted physical education program needed to be in-person in a classroom setting to work on her movement activities in the gait trainer, stander, sidelyer, and other adapted activities.

When a school district does not perform exactly as called for by the IEP, the district does not violate the IDEA unless it is shown to have materially failed to implement the child's IEP.  (*Van Duyn, supra,* 502 F.3d at p. 815.)  Bellflower materially failed to implement Student's IEP.  Student's instructional and service minutes were

reduced, but Student did not establish what levels she required.  Although Orange County Department of Education and its staff did their best to adapt a virtual program to implement Student's IEP, many of her goals required in-person services as provided at Mann Special Classes.  Orange County Department of Education and Bellflower followed the public health and safety orders which prevented them from providing the in-person services Student needed.  Due to her multiple disabilities, Student could not meaningfully access online instruction during the spring of 2020.

ISSUE 3:  DID BELLFLOWER DENY STUDENT A FAPE IN THE MAY 2020 IEP?

ISSUE 3A:  SUFFICIENT INFORMATION IN THE MAY 2020 IEP REGARDING STUDENT'S PRESENT LEVELS OF PERFORMANCE

Student claims that the May 27, 2020 IEP failed to provide sufficient information regarding Student's present levels of performance and therefore did not offer Student appropriate measurable goals in the areas of pre-academic-academic and functional skills, communication development, gross and fine motor development, social-emotional behavior, vocational skills, and adaptive living skills.

Bellflower alleges it provided sufficient information regarding Student's present levels of performance in her areas of unique need, and the goals were both measurable and appropriate.

An IEP must include a statement of the individuals present levels of academic achievement and functional performance, including the manner in which the disability affects her involvement and progress in the general education curriculum, and a description of benchmarks or short-term objectives, based on alternate achievement standards. (Ed. Code, §56345, subd. (1)(a).)

30

Student did not establish the May 27, 2020 IEP failed to provide sufficient information on her present levels of performance and offer appropriate academic goals. Bellflower sent Parent notice of an annual IEP team meeting for April 28th 2020 IEP, and Parent postponed the meeting until May 27, 2020.  Parent initially did not want to participate in the IEP because she was not happy with the virtual program.

Parents did not believe the present levels of performance reported by the teacher and therapists were accurate because the lack of in-person instruction during the COVID-19 closure meant the providers did not have accurate information.  However, Parent was an active member of the IEP team and contributed the updated information about Student's performance in all areas as of May 27, 2020.

Parent alleged there was some overlap with present levels of performance documented in Student's 2019 and 2020 IEPs.

For example, in the area of functional academics, the May 2020 IEP noted Student was able to move her head from side to side, see lighted items 6- to 12-inches from her central vision and could activate a switch up to 11 times in a 20-minute session.  She smiled when she heard familiar voices, favorite TV shows, and music.  However, Student did not establish this was not an accurate statement of her present level of performance in these areas as of May 2020, even if the information was identical to the present levels of performance in these activities in May 2019.  There was no credible evidence or expert testimony that contradicted the information regarding Student's abilities at these tasks as of May 2020.

For reading, Student could track a book that was read to her for four pages in four out of five trail days.  Student did not establish this was not an accurate statement of her present level of performance in these areas as of May 2020, even if the

information was identical to the present levels of performance in these activities in May 2019. There was no credible evidence or expert testimony that contradicted the information regarding Student's abilities at these tasks as of May 2020.

As to communication development, Student could look toward a speaker by turning her head toward her communication partner in seven out of 10 times. Student did not establish this was not an accurate statement of her present level of performance in these areas as of May 2020, even if the information was identical to the present levels of performance in these activities in May 2019. There was no credible evidence or expert testimony that contradicted the information regarding Student's abilities at these tasks as of May 2020.

Regarding gross motor skills, Student could tolerate pre-gait activities in the front-leaning walker, or gait trainer, between 15- to 20-minutes long. Student did not establish this was not an accurate statement of her present level of performance in these areas as of May 2020, even if the information was identical to the present levels of performance in these activities in May 2019. There was no credible evidence or expert testimony that contradicted the information regarding Student's abilities at these tasks as of May 2020.

In the area of social-emotional development, Student could respond with a vocalization or giggle when she was presented with a shiny object 6- to 12-inches from her central vision and was given a verbal prompt, "are you ready," in eight out of 10 trials. Student did not establish this was not an accurate statement of her present level of performance in these areas as of May 2020, even if the information was identical to the present levels of performance in these activities in May 2019. There was no credible evidence or expert testimony that contradicted the information regarding Student's abilities at these tasks as of May 2020.

32

As to adaptive daily living, Student could follow a one-step direction 10 times throughout her day in eight of 10 trials.  Student did not establish this was not an accurate statement of her present level of performance in these areas as of May 2020, even if the information was identical to the present levels of performance in these activities in May 2019.  There was no credible evidence or expert testimony that contradicted the information regarding Student's abilities at these tasks as of May 2020.

For vocation, Student could maintain contact with an object placed in her hand for one to two minutes and not bring her hands to her face in eight out of 10-turns for five trials days.  Student did not establish this was not an accurate statement of her present level of performance in these areas as of May 2020, even if the information was identical to the present levels of performance in these activities in May 2019.  There was no credible evidence or expert testimony that contradicted the information regarding Student's abilities at these tasks as of May 2020.

Student failed to establish that accurate present levels of performance were not provided, and or that sufficient information about Student's skills and abilities was not provided to Parent.  Parent actively participated in the IEP and contributed updated information to the team.

## ISSUE 3B:  MEASUREABLE GOALS IN THE MAY 27, 2020 IEP

The purpose of annual goals is to permit the IEP team to determine whether the pupil is making progress in an area of need.  (Ed. Code, § 56345, subd. (a).)  For each area in which a special education student has an identified need, the IEP team must develop measurable annual goals that are based upon the child's present levels of academic achievement and functional performance, and which the child has a reasonable chance of attaining within a year.  (Ed. Code, § 56345; *Letter to Butler*

(OSERS March 25, 1988); Notice of Interpretation, Appendix A to 34 C.F.R., part 300, Question 4 (1999 regulations).)  The IEP team need not draft IEP goals in a manner that the parents find optimal, as long as the goals are objectively measurable.  (*Bridges ex rel. F.B. v. Spartanburg County School Dist. Two* (D.S.C., Sept. 2, 2011, No. 7:10-CV-01873-JMC) 2011 WL 3882850 (*Bridges*) [the use of percentages tied to the completion of discrete tasks was an appropriate way to measure student progress].)

Goals are deemed measurable when they can be measured by grade level and accuracy level.  An IEP must include a statement of measurable, annual academic and functional goals designed to meet the needs of the student.  An IEP must also include a description of how the students' progress toward annual goals will be measured.  (Ed. Code, §56345, subds. (a)(2), (3).)

On May 27, 2020, the IEP team developed seven goals in Student's unique areas of need.

Student's functional academics goal projected that when Student was seated in an upright position with a head switch attached to a tablet on a mount within her central vision or sensory device, she would increase her ability to move her head from side to side and activate the switch.  Her present level of performance at this task in May 2020 was activating the switch 11 times in a 30-minute session.  The new annual goal was to increase her ability to 12 times in a 30-minute session in eight out of 10 trials, by August 30, 2020, to 14 times by December 30, 2020, and to 15 times by April 30, 2021, as measured by the instructional plan and data collection.

Student did not establish the functional academics goal was not objectively measurable.  The goal specified the number of times in a 30-minute session the observer and data collector must observe Student activating a switch.

Student's reading goal projected that when presented with a book that an adult read slowly, she would increase her ability to track the book in eight out of 10 trials. In May 2020, Student tracked by shifting her eye gaze from left to right for four pages. The new annual goal was to increase her ability and have her shift her eye gaze from left to right for one-third of the story in eight of 10 trials by August 30 2020, track the book from left to right for two-thirds of the story by December 30, 2020, and for the full story by April 30, 2021, as measured by the instructional plan and data collection. Lopez did not specify how long the stories were.

Student did not establish the reading goal was not objectively measurable. The goal specified the percentage of the story the observer and data collector must observe Student tracking a book and gazing from left to right. The fact that the length of the full story was not detailed in her goal did not mean it was not measurable. Although the pre-academic books varied slightly in their length, Lopez was able to measure the length of the books she presented to Student.

Student's communication development goal projected that when Student was taken on an errand on campus by staff, Student would increase her ability to interact and respond to a partner by turning towards them and vocalizing from her May 2020 baseline of seven out of 10 opportunities, to eight out of 10 opportunities four out of five trial days by August 30, 2020, nine out of 10 opportunities by December 30, 2020, and 10 out of 10 opportunities on four out of five trial days by April 30, 2021, as measured by the instructional plan and data collection.

Student did not establish the communication development goal was not objectively measurable. The goal specified the number of times and opportunities the observer and data collector must observe Student turn toward a communication partner and vocalize.

Student's gross motor goal projected that when positioned in a supine stander with supports and AFOs, Student would increase from standing in a walker or gait trainer for 15 to 20 minutes, to standing in a stander for 20 minutes on four out of five trial days by August 30, 2020, to 25 minutes by September 30, 2020, and for 30 minutes on four out of five trial days by April 30, 2021, as measured by the instructional plan and data collection.

Student did not establish the gross motor goal was not objectively measurable. The goal specified the length of time and number of days the observer and data collector must observe Student standing in her stander.

Student's social-emotional goal projected that when presented with a communication object on a shiny card, Student would increase her responses from a vocalization "ah" or a giggle for eight out of 10 trials, to 60 percent by August 30, 2020, 80 percent by December 30, 2020, and 100 percent in eight out of 10 trial days by April 30, 2021, as measured by the instructional plan and data collection.

Student did not establish the social-emotional goal was not objectively measurable. The goal specified the percentage of vocalization responses and number of days the observer and data collector must observe Student vocalizing in response to seeing a communication object.

Student's adaptive daily living goal projected she would increase her receptive language skills by following one-step directions within the context of daily routines, such as holding an object, turning to look at an object or person, opening and closing her mouth, or making choices, from 10 times in her day on eight out of 10 trial days, to following one-to two-step directions with 60 percent accuracy for eight out of 10 trial days by August 30, 2020, to 80 percent accuracy by December 30, 2020, and 100

36

percent accuracy on eight out of 10 trial days by April 30, 2021, as measured by the instructional plan and data collection.

Student did not establish the adaptive daily living goal was not objectively measurable.  The goal specified the accuracy of correct responses and number of days the observer and data collector must observe Student following the one-to two-step directions given.

Students vocational goal projected that she would be seated upright and participate in an exercise program by allowing adult assistance with the exercise routine for four minutes in four out of five trial days by August 30th 2020, eight minutes in four out of five trials days by December 30th 2020, to 10 minutes in four out of five trial days by April 30th 2021, as measured by the instructional plan and data collection.

Student did not establish the vocational goal was not objectively measurable. The goal specified the length of time and number of days the observer and data collector must observe Student participating in the exercise program.

Student did not meet her burden of proof that the May 27, 2020 IEP failed to offer measurable goals.

ISSUE 3C: APPROPRIATE GOALS IN THE MAY 27, 2020 IEP

For each area in which a special education student has an identified need, the IEP team must develop measurable annual goals that are based upon the child's present levels of academic achievement and functional performance, and which the child has a reasonable chance of attaining within a year.  (Ed. Code, § 56345.)  Goals are deemed appropriate when they address each are of unique need, are based on present levels of performance, and present a challenging series of objectives.

37

As discussed above, the IEP team developed seven goals in Student's unique areas of need, based them on Student's present levels of performance as of May 2020 and what Student had a reasonable chance of attaining in one year.

Student did not establish the functional academics goal was not appropriate. It addressed an important area of unique need. It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the reading goal was not appropriate. It addressed an area of need. It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the communication development goal was not appropriate. It addressed an important area of unique need. It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the gross motor goal was not appropriate. It addressed an important area of unique need. It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the social-emotional goal was not appropriate. It addressed an important area of unique need. It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the adapted daily living goal was not appropriate.  It addressed an important area of unique need.  It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the vocational goal was not appropriate.  It addressed an important area of unique need.  It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Therefore, Student did not meet her burden of proof that the May 27, 2020 IEP failed to offer appropriate goals.

ISSUE 3D:  DID BELLFLOWER DENY STUDENT A FAPE AT THE MAY 27, 2020 IEP BY FAILING TO OFFER APPROPRIATE IN-PERSON SERVICES AT HOME?

Student asserts due to her unique disabilities; she required in-person services at home during the COVID-19 pandemic.  Student alleges Bellflower's failure to offer in-person services at her home denied her a FAPE.

Bellflower asserts it was not required to offer Student in-person services at home in the May 27, 2020 IEP.

A child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.  (*Rowley*, *supra*, 458 U.S. 176, 201-204[102 S. Ct. 3034]; *Endrew F., supra,* 580 U.S. _ [137 S.Ct. 988, 1000].)

Student does not challenge the appropriateness of the placement and services offered in the May 27, 2020 IEP, based upon public schools reopening for in-person learning.  Parent agreed to all parts of the May 27, 2020 IEP on June 11, 2020.

- placement at Mann Special Classes specialized academic instruction, 360 minutes per day;
- language and speech therapy 120 minutes per month individually, and 120 minutes per month in a group;
- occupational therapy consultation, 60 minutes per month;
- physical therapy 160 minutes per month individually;
- health and nursing specialized physical health care services, 270 minutes per day to assist with bowel/ bladder care, gastronomy tube feedings with a pump, assisted oral feedings, assisted positioning, assistance with AFOs;
- health and nursing - other services, consultation 60 minutes per year;
- specialized vision services, consultation, 30 minutes per month;
- a one-to-one aide, for support to prevent injury, 360 minutes per day;
- adapted physical education services120 minutes monthly in a group;
- transportation; and
- extended school year services.

Student challenges the virtual program which began April 1, 2020.  Bellflower and Orange County Department of Education made all educational programs and home-hospital instruction programs virtual in response to the COVID-19 pandemic closure of school campuses.  Bellflower did not offer in-person or in-home services because it followed state and county public health and safety mandates.

The May 27, 2020 IEP team discussed Student's distance learning services program when school campuses were closed during the pandemic.  Parent was

40

concerned Student was not receiving any of her therapies.  Student received home nursing services eight hours per day from CCS.

Parent requested the equipment Student used at school so that it could be used at home.  The IEP team agreed to send the school's stander to Student's home as long as CCS would provide the home training for its use.  They discussed how CCS was responsible for Student's home therapy and assistance with standing and mobility during COVID-19 isolation practices.

Bellflower offered a Google Classroom with Zoom lessons and ancillary embedded activities.  Bellflower also sent home materials for hands-on activities.  Parent agreed to all parts of the May 27, 2020 IEP on June 11, 2020.

California passed legislation effective July 1, 2020 requiring an IEP to specify the means by which IEP services would be provided under emergency conditions at the student's next regularly scheduled IEP. (Ed. Code, §56345, subd. (a)(9)(A),(B).) At the time Student's May 27, 2020 IEP was held, Bellflower was not yet required to develop an emergency services provision in an IEP when it was unable to implement Student's IEPs when special education and related services could not be provided in school or in person due to emergency conditions for more than 10 school days.  (Ed. Code, §56345, subd. (a)(9)(A),(B).)  At the time, the administrators did not know when public health officials would re-open on-campus in-person learning.

Student did not establish Bellflower denied her a FAPE by failing to develop an emergency services IEP and offer in-person services in her home.  The requirement of an emergency services provision being added to IEPs at a student's next IEP team meeting did not go into effect until July 1, 2020.

ISSUE 4:  DID BELLFLOWER DENY STUDENT A FAPE DURING THE
2020-2021 SCHOOL YEAR, BY FAILING TO IMPLEMENT ALL PARTS OF
STUDENT'S IEP, INCLUDING WHEN IN-PERSON LEARNING REOPENED BUT
STUDENT COULD NOT ATTEND BECAUSE SHE HAD NOT YET BEEN
VACCINATED AGAINST COVID-19?

Student contends Bellflower failed to implement her IEP, including when in-
person learning reopened in October 2020, but she could not attend because she had
not had the COVID-19 vaccination yet.

Bellflower asserts it offered an appropriate virtual program.  It alleges it offered
Student a FAPE when Mann Special Classes reopened.

While Student alleged in the heading of her complaint that Bellflower failed to
implement her IEP, the body of the complaint, proposed issue statement and closing
brief alleges Bellflower did not offer the same services to Student in a different
environment by failing to hold an IEP and offer home hospital instruction.  Bellflower
defended this claim at hearing and in its written closing brief.  However, because
Student raised the issue of whether Bellflower denied Student a FAPE for failing to
implement her IEPs as written, it is discussed below.  (*M.C. v. Antelope Valley Union High
School Dist.*, *supra*, 858 F.3d at p. 1196, fn. 2 [dictum].)

FAILURE TO IMPLEMENT THE IEPS AS WRITTEN

On August 25 2020, the 2020-2021 school year began with Google Classroom
and services.  Student relied on Parent to sign onto Zoom and follow her schedule, but
Parent only intermittently accessed Student's Zoom classroom sessions and services.
Parent failed to join the Zoom sessions, or joined the sessions while Student was

42

sleeping.  Parent often said she was tired and overwhelmed and did not want to help Student participate in sessions with the virtual service providers because she was not a trained aide.  Parent kept Student's school supplies in a room for eight months and did not use them during sessions to work on Student's goals.

The virtual program did not provide Student a FAPE.  Student's placement at Mann Special Classes was an all-inclusive special education center for severely disabled students, provided by Orange County Department of Education.  Due to the pandemic, Bellflower was unable to offer in-person instruction and related services on campus until public health and safety orders allowed it.

Student required in-person services to meaningfully access her educational program.  Student's multiple disabilities included vision impairment, orthopedic impairment, seizure activity, cerebral palsy, and low physical and cognitive skills. Student required in-person services because she needed adult assistance for safety and assistance with transitioning and standing, hand-over-hand prompting, and nursing services throughout her day so she could work on her seven goals.

Student established that between August 25, 2020 and October 25, 2020, Bellflower failed to implement Student's IEP because Mann Special Classes was closed, and Bellflower provided a virtual program that did not meet Student's unique needs.

STUDENT'S CHALLENGE TO BELLFLOWER'S FAILURE TO GIVE NOTICE OF HOME HOSPITAL INSTRUCTION AVAILABILITY AND HOLD IEP TEAM MEETING TO REVIEW AND REVISE STUDENT'S PLACEMENT AND SERVICES, AND OFFER HOME HOSPITAL INSTRUCTION

THE MEDICAL NOTE FOR VIRTUAL INSTRUCTION FOR SIX MONTHS TRIGGERED THE NEED FOR IEP TEAM MEETING AND DISCUSSION BUT THE FAILURE TO DO SO WAS NOT A DENIAL OF FAPE

On October 12, 2020, Student's doctor, Ramesh Desai, faxed a brief note ordering Student to continue virtual distance learning for the next six months, due to chronic health conditions, until the COVID-19 vaccine became available and was administered. The doctor's note was vague and did not specify the health condition or conditions he believed made Student unable to attend an on-campus educational program, which, which reopened on October 26, 2020.  Student did not present at hearing the medical evidence required to prove Student had a medical condition requiring home hospital instruction on or after October 26, 2020.

Beginning October 12, 2020, Bellflower had knowledge of Student planning to not return to Mann Special Classes on October 26, 2020.  The doctor's note mentioned a vague, non-specific health condition, which warranted further discussion.  Bellflower was required to notify Parent and discuss home hospital placement options at an IEP team meeting.

Bellflower held an IEP team meeting on February 19, 2021.  The IEP team discussed Parents concerns about in-person instruction and distance learning.  The IEP

44

team requested clarification about the doctor's note and asked who needed to be vaccinated.  Despite the doctor's note suggesting it was Student who needed to be vaccinated before she returned to school, Parent responded that the note was for school staff to be vaccinated, because Student was too young to be vaccinated.  The principal told Parent that staff were currently in the process of signing up to receive their COVID-19 vaccines.

While the IEP team clarified information about the doctor's note, it did not discuss home hospital instruction specifically.  Rather, the school principal talked about wanting Student to return back to in-person learning on the school campus.  The IEP team talked about how Mann Special Classes had a full-time registered nurse and two full-time licensed vocational nurses on site, and all staff in the classroom were trained to help with gastronomy-tube feeding.  The school nurse worked with Student's doctor for medication updates.  The nurse asked for updates on Student's hip surgery.  The IEP team discussed the need for assessments for Student's upcoming triennial assessment.  Bellflower and Orange County Department of Education explained how the assessors would wear full personal protective equipment when interacting with Student.  However, Parent did not consent to the triennial assessments.

The IEP team also discussed Student's transition to high school for ninth grade.  They discussed transportation required.  The IEP team also discussed how the gait trainer was sent home, along with other school materials, which they offered Parent at the beginning of pandemic.  The physical therapist assisted Parent with sessions by videoconference.  The IEP team discussed how Student was accessing the virtual services at home and making progress.

Bellflower's knowledge of significant changes in Student's current medical condition and prolonged medical absence triggered an obligation to explore the details

45

and effects of Student's unspecified "chronic health condition."  Bellflower was required

to notify Parent about the availability of home hospital instruction as a possible

placement option at the IEP team meeting.  Bellflower was required to discuss in further

detail with Student's doctor why Student could not attend their program due to medical

concerns, and whether there were protocols and accommodations that could be

developed to allow Student to attend the program in spite of her vague "chronic health

conditions."  The school nurse spoke with Student's doctors regarding medication at the

beginning of February 2021.  However, there was no evidence Bellflower attempted to

communicate with Student's pediatrician, Dr. Ramesh Desai, under a pre-existing release

of information authorization form, or sought from Parent a written release of

information authorization to enable Bellflower to communicate with Dr. Desai about the

reasons Student was reportedly unable to attend school and to investigate options to

enable Student to safely attend Mann Special Classes.

A procedural violation of FAPE results in liability only if the violation impeded the

child's right to a FAPE, significantly impeded the parent's opportunity to participate in

the decision-making process; or caused a deprivation of educational benefits.  (20 U.S.C.

§ 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2); see *W.G. v Board of Trustees of Target*

*Range School Dist. No. 23* (*supra*) 960 F.2d. at1484.)

Bellflower committed a procedural violation because it did not timely convene an

IEP team meeting to determine appropriate educational services for Student, as

required, even based on the limited information Bellflower received in the

October 12, 2020 doctor's note.  The IEP team should have reviewed, and revised if

appropriate, the IEP based on a significant change in Student's current medical

condition.  (Ed. Code, § 48206.3; Cal. Code Regs., tit. 5, §§3051.4, subd. (c), 3051.17, subd.

46

(c).) Bellflower failed to discuss any changes of placement or services at the IEP team meeting.

However, this procedural violation did not impede Student's right to a FAPE, did not significantly impede Parent's opportunity to participate in the decision-making process, or cause Student a deprivation of educational benefits. At the time of Student's IEP, home hospital instruction was also virtual, due to COVID-19 public health and safety orders. This is a procedural violation without discernable harm because an IEP discussion would not have changed how services were delivered to Student. (20 U.S.C. § 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2); see *W.G. v Board of Trustees of Target Range School Dist. No. 23* (*supra*) 960 F.2d. at1484.) It did not impede Parent's opportunity to participate in the decision-making process because the delivery of services would have been identical in the virtual setting. Similarly, it did not deprive Student of educational benefit because both the academic instruction and related services would have been provided virtually, even if home hospital instruction had been discussed and offered.

Moreover, the results of an IEP team meeting are speculative, especially because Parent informally stated she wanted Student to continue receiving services at Orange County Department of Education's Mann Special Classes, because she knew a home hospital placement would have resulted in Student transferring back to Bellflower's program. Student did not prove any IEP team meeting held before February 19, 2021, would have led to a change of placement in Student's IEP. A home hospital instruction placement would not have been appropriate when school reopened and Student was offered her classroom program, as discussed below. This procedural violation without discernable harm is not a denial of FAPE. (20 U.S.C. § 1415(f)(3)(E)(ii); Ed. Code, § 56505,

subd. (f)(2); see *W.G. v Board of Trustees of Target Range School Dist. No. 23* (*supra*) 960 F.2d. at1484.)

## IN-PERSON CLASSROOM PROGRAM WAS STUDENT'S FAPE WHEN IT REOPENED

To determine whether a special education student could be satisfactorily educated in a regular education environment, the Ninth Circuit has balanced the following factors:

- the educational benefits of placement full-time in a regular class;
- the non-academic benefits of such placement;
- the effect the student has on the teacher and children in the regular class; and
- the costs of mainstreaming the student.

(*Sacramento City Unified School Dist. v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1404 (*Rachel H.*) [adopting factors identified in *Daniel R.R. v. State Board of Education* (5th Cir. 1989) 874 F.2d 1036, 1048-1050 (*Daniel R.R.*)].)

If a school district determines that a child cannot be educated in a general education environment, then the least restrictive environment analysis requires determining whether the child has been mainstreamed to the maximum extent that is appropriate in light of the continuum of program options.  (*Daniel R.R.*, *supra*, 874 F.2d at p. 1050.)

Not solely one factor is determinative in placement, and parental preference cannot be either the sole or predominant factor in placement decisions.  (See, e.g., Letter to Burton (OSERS March 20, 1991); Letter to Anonymous (OSEP April 20, 1994); Letter to Bina (OSERS November 5, 1991).)

In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program. (*Gregory K. v. Longview School Dist.* (9th Cir. 1987) 811 F.2d 1307, 1314.)  For a school district's offer of special education services to a disabled pupil to constitute a FAPE under the IDEA, a school district's offer must be designed to meet the student's unique needs, comport with the student's IEP, and be reasonably calculated to provide the student with educational benefit appropriate in light of the student's circumstances, in the least restrictive environment.  *(Endrew F.*, supra, 580 U.S. _ [137 S.Ct. at p. 1000].)

Whether a student was offered or denied a FAPE is determined by looking to what was reasonable at the time the IEP was developed, not in hindsight.  (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149, citing *Fuhrman v. East Hanover Board of Education* (3d Cir. 1993) 993 F.2d 1031, 1041.)

An IEP need not conform to a parent's wishes to be sufficient or appropriate. (*Shaw v. District of Columbia* (D.D.C. 2002) 238 F.Supp.2d 127, 139 [IDEA did not provide for an "education . . . designed according to the parent's desires."]; *J.R. v. Sylvan Union School Dist.* (E.D.Cal., March 10, 2008, No. CIV S-06-2136 LKK GGH PS) 2008 WL 682595, **10-11.)  A school district is not required to place a student in a program preferred by a parent, even if that program will result in greater educational benefit to the student. (*Ibid.*)  A school district has the right to select the program offered, if the program is able to meet the student's needs, and the district is ultimately responsible for ensuring a FAPE is offered.  (*Letter to Richards* (OSEP January 7, 2010).)  The Ninth Circuit has held that while the school district must allow for meaningful parental participation, it has no obligation to grant the parent a veto over any individual IEP provision.  (*Ms. S. ex rel G. v. Vashon Island School Dist.* (9th Cir. 2003) 337 F.3d 1115, 1131.)

On October 26, 2020, Orange County Department of Education's Mann Special Class reopened for in-person learning in the classroom with a cohort of staff and students, all wearing masks, and following other safety precautions.  In spite of safety precautions taken, there were several positive COVID-19 cases reported in the cohorts at Mann Special Classes during the 2020-2021 school year.

Student did not return to the classroom because Parent chose to continue with virtual distance learning for the remainder of the school year.  Parent declined the on-campus program to protect Student from the threat of an illness, without evidence of being immunocompromised.  However, that is not a consideration in the least restrictive environment analysis.  (*Rachel H*., *supra,* 14 F.3d 1398.)  Beginning October 26, 2020, Bellflower made a FAPE available to Student by implementing her IEP in the classroom setting.  While the factors in *Rachel H*. are used in determining whether a student can be removed from the general education classroom, which is not a consideration here, the analysis which the Ninth Circuit used demonstrates that a parent's concern about contagious illnesses is not an identified factor.

Parent's concern about the COVID-19 virus was very understandable.  However, Parent's choice to keep Student home in the most restrictive environment, is not supported by the law.  The continuum of placement settings is based upon the environment in which Student can make progress, not the environment in which Student seeks to avoid contracting a disease, without medical evidence of being immunocompromised.

In evaluating the continuum of placement options, the appropriate placement is decided by the Student's IEP team based on her unique areas of need, present levels of performance, appropriate goals, and a determination of the environment and placement in which Student can make progress on her goals.  The statutory preference is for

general education, a resource specialist room, then a special day class.  Student required
the comprehensive program at the special education center operated by Orange County
Department of Education as her least restrictive environment.  The law does not provide
for a parent's concern to avoid illness to override the preference for the least restrictive
setting.  Home hospital instruction is the most restrictive setting because of its lack of
opportunities for peer socialization and group therapy services.

Mann Special Class was the most appropriate placement because it imbedded all
the complex components of Student's program in the least restrictive setting.  Many of
Student's teachers and service providers remained with her for several years and knew
her well.  Their knowledge and expertise, collaboration in the classroom, and layered
and scaffolded therapies provided the gold standard for addressing Student's complex
needs.

Bellflower fulfilled its obligation to make a FAPE available beginning
October 26, 2020 when the on-campus program at Mann Special Classes reopened and
was made available to Student.  Here, Bellflower made the in-person classroom available
to Student as of October 26, 2020, and therefore it did not deny Student a FAPE.

## STUDENT DEMONSTRATED INITIAL EDUCATIONAL LOSSES BUT OVERALL EDUCATIONAL GAINS

Student asserts it was difficult for Parent to keep track of the posted virtual
school schedules and work with her home nurse for daily living needs.  Student lost her
daily classroom routine.  Student had more seizure activity and slept during the day.
Parent was frustrated with virtual services and did not feel qualified to substitute for the
specialists' hands during educational therapies.  A home nurse was present eight-hours
per day to help Student with daily living, and she often participated on Zoom calls with

the physical therapist, assisting Parent to facilitate Student's participation in the videoconference therapy.  Parent failed to consistently access the virtual sessions via the Zoom classroom and participate in the Zoom therapies.  On many occasions, Parent used the time to complain to the service providers about other staff members.  Parent was often hostile and angry when speaking with the staff.  Parent's actions made the teacher and service providers uncomfortable.  In response, the staff adopted a team approach, and two staff members joined each Zoom session to make sure the time was productive providing Student with her therapies.

Although Student demonstrated some initial losses of skills during virtual instruction, Student made considerable educational gains during virtual instruction, in spite of not attending the reopened Mann Special Classes, and in spite of multiple unexcused absences from virtual instruction.

Student's greatest areas of need were mobility, communication, social-emotional skills, and daily living.  Although Student did not have access to her classroom equipment during distance learning, and missed many more sessions that she participated in, she still made substantial gains in her educational goals.  For example, her physical therapist and speech therapist worked with Student and Parent virtually and credibly reported significant progress on her goals.

Student's physical therapy in the classroom was designed for Student's mobility focused on moving her legs and standing in an educational environment, to help her access the classroom educational environment.  Student's physical therapist provided a weekly virtual program on Zoom instructing Parent how to do physical therapy at home.

Student's gross motor goal included using a supine stander and a gait trainer. The stander weighed 125 pounds, stood six to seven feet tall, and had a footprint of

three feet by three feet.  The gait trainer was approximately three feet tall and had a footprint of three feet by three feet.  This equipment was used in the classroom.  Parent initially declined having the equipment moved into her apartment, claiming it was too large.  Bellflower and Orange County Department of Education offered to bring them to Student's apartment at the beginning of the pandemic.  Parent finally agreed to allow the gait trainer to be sent home by January 20, 2021.  In spite of Parent's claim, the gait trainer was not too large to fit in her apartment after all.

On February 10, 17, and 20, 2021, the physical therapist consulted with Parent and Student's home nurse to put her in the gait trainer.  By February 25, 2021, Student had increased her ability to stand, for up to 25 minutes.  Student was on track to meet her gross motor goal, which projected that when positioned in a supine stander with supports and AFOs, Student would increase from standing in a walker or gait trainer for 15 to 20 minutes, to standing in a stander for 30 minutes on four out of five trial days by April 30, 2021, as measured by the instructional plan and data collection.

Student' communication development and social-emotional goals required Student to respond to a partner by turning towards them and vocalizing, and to respond to a shiny communication object with a vocalization giggle, as measured by the instructional plan and data collection.  After working with Student's speech therapist virtually, by May 21, 2021, Student had begun babbling and said three distinct words, "oh no" and "after."  Student even advanced to the point where she called for her mother with a vocalization.  This represented unprecedented progress in her speech development and social emotional development, far beyond her goals.  Student had never vocalized any words before except for saying "ah," and advanced to uttering three distinct words in appropriate context and calling for Parent.  Student had advanced from

only using receptive language, to using expressive language, a much more advanced skill.

Student's speech therapy was previously delivered in person individually and in a group.  The speech pathologist had Zoom sessions with Student.  Student's teacher delivered materials to Student's home by April 2020 and sent visual cards home by May 2020.  However, Parent put the visual and communication aides in a bedroom, forgot about them for eight months, and did not use them.  Without using the visual cards, Student devised another way to communicate and began using verbal responses, such as a giggling or saying, "ah," "oh no," and "after."  The speech pathologist began to work on these higher-level skills than the visual cards, and scaffolded Student's emerging skills.  The speech pathologist gave Parent examples of how to use one-step directions, hold Students head up, open her mouth, and work on progress with vocalizations and choice making.  The speech pathologist suggested multiple educationally based websites for Parent to access songs, interactive videos, shapes, and numbers for Student.  By May 21, 2021, Student had begun babbling and said three distinct words.  She also improved and developed emerging skills for making choices and providing "yes" and "no" responses.

The speech pathologist estimated she had provided at least 10 sessions via Zoom, and that many more were missed by Parents.  The majority of the time, Student missed sessions because Parent either cancelled them, or Student was asleep.

Student's functional goal was to sit in a wheelchair or activity chair and press her head against a switch that turned on a device such as a toy, audio on an iPad, and other educational content.  Student's teacher asked Parent to allow both head switches to be sent home, and Parent finally agreed to accept them by January 2021, but Parent was not interested in using them.  While the goal was necessary for functional academics,

Student spent most of her time in bed.  She did not sit in her wheelchair, to which the switch was designed to be attached and positioned for use by Student.  As a result, the vision therapist worked with Parent to attach Student's iPad to her bed in front of her central vision, which delighted Student.  Parent and the vision therapist discussed what educational websites Student responded to, as Parent reported Student spent hours happily watching her iPad screen, even without the head switch.  Parent was concerned Student spent so many consecutive hours on the iPad, and requested blue light blocking glasses.  The vision specialist ordered and provided them, but Parent only used them on Student once for two hours.  The iPad instructional videos held Student's attention for much longer than her goals projected.

Student's virtual occupational therapy consultations were appropriate and did not need to be in person.  The Zoom consultations that the occupational therapist provided directly to Student, Parent and Student's nurse, appropriately trained them on occupational therapy exercises for Student.  While Student was home, CCS was responsible for home services.  The school physical therapist held Zoom consultation meetings with Parent, the nurse as an aide, and Student from March 2020 through the end of 2021.  Parent did not want to facilitate therapy without Student's equipment, and despite Bellflower or Orange County Department of Education offering to deliver the equipment to Student's home, Parent refused it and said she was not ready for the gait trainer in her home, even by December 2020.  While Parent initially had trouble transferring Student from the bed to the wheelchair, the physical therapist trained Parent to transfer Student from the bed, to a gait trainer, to the wheelchair by October 14, 2020.  CCS was involved at this time.

Although Student required an in-person program, she made considerable progress in these critical areas of need during virtual instruction.  Student did not

provide evidence of the need for compensatory education, or of any type, amount, or duration.  As a further consideration, Parent's failure to diligently sign on to the Zoom sessions placed Bellflower and Orange County Department of Education at a disadvantage.  Mann Special Classes staff prepared for the Zoom sessions, showed up at the Zoom sessions, and in many cases, had two staff on the Zoom calls, only to have their time wasted when Parent did not sign on, or did not wake Student up to participate in the educational program.  Parent failed to mitigate this waste of resources.  Parent pretended she would be able to facilitate a virtual program for Student, and instead cancelled or did not show up.   Instead of allocating staff for services which would have benefited Student, Bellflower and Orange County Department of Education wasted their resources funding a program Student did not access consistently.  This is considered when determining the appropriateness of compensatory education as a remedy for Bellflower's denial of FAPE to Student from August 25,through October 25, 2020.

ISSUE 5:  DID BELLFLOWER DENY STUDENT A FAPE IN MAY 2021 IEP BY FAILING TO PROVIDE SUFFICIENT INFORMATION REGARDING STUDENT'S PRESENT LEVELS OF PERFORMANCE AND TO OFFER MEASUREABLE AND APPROPRIATE GOALS?

Student claims the May 10, 2021 IEP failed to provide sufficient information regarding Student's present levels of performance and therefore did not offer Student appropriate measurable goals in the areas of pre-academic,-academic, and functional skills, communication development, gross and fine motor development, social-emotional behavior, vocational skills, and adaptive living skills.

56

Bellflower contends it provided sufficient information, the present levels of performance were accurate, and the goals were measurable and appropriate.

## ISSUE 5A: SUFFICIENT INFORMATION REGARDING PRESENT LEVELS OF PERFORMANCE

An IEP must include a statement of the individuals present levels of academic achievement and functional performance, including the manner in which the disability affects her involvement and progress in the general education curriculum, and a description of benchmarks or short-term objectives, based on alternate achievement standards. (Ed. Code, §56345, subd. (1)(a).)

A school district must conduct a reassessment at least once every three years, unless the parent and the agency agree that it is unnecessary. (20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. § 300.303(b)(2); Ed. Code, §§ 56043, subd. (k), 56381, subd. (a)(2).) The district must also conduct a reassessment if it determines that the educational or related service needs of the child, including improved academic achievement and functional performance, warrant a reassessment. (20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. § 300.303(a)(1); Ed. Code, § 56381, subd. (a)(1),(2).) However, the district is not required to attempt to override a lack of parental consent to assess.

Student asserts the present levels of performance reported were not accurate because, as in the previous IEP, there was some overlap with present levels of performance in her 2020 IEP. Bellflower asserts it provided sufficient information for parental participation.

Bellflower scheduled Student's annual IEP for April 27, 2021, but Parent postponed it until May 10, 2021. Parent initially did not want to participate in the IEP team meeting because she was not happy with the virtual program.

57

Student did not establish the May 10, 2021 IEP failed to provide sufficient information regarding her present levels of performance.  Parent did not consent to Bellflower's February 25, 2021 request for a triennial assessment plan, which was required for Bellflower to conduct formal assessments to gather current data.  Student missed most of her special education and related services because Parent did not sign onto Zoom sessions and did not wake Student up for her sessions.  Each of these actions prevented the IEP team from collecting additional observations and data collection.  Parent actively prevented Bellflower from assessing Student both formally and informally and cannot claim it provided insufficient information regarding Student's present levels of performance, after Parent chose to not act as a collaborative member of the IEP team.  Student was 15 years old and her low cognitive level between birth and seven-months-old signified very low potential for growth, and therefore overlapping present levels of performance year to year appear commensurate with her slow progress.

Student had multiple disabilities with significant orthopedic, physical, visual, and cognitive impairments.  Some present levels of performance did appear lower than before the COVID-19 closures.  However, Student was 15 years old with a cognitive developmental level between zero- and seven-months-old, and there was no expert testimony estimating her potential for development beyond those levels.  Student did not establish that the slight overlap of some reported present levels of performance in May 2020 and May 2021 meant the levels reported were not accurate.

In the area of functional academics in May 2021, when Student was positioned in her chair, she could activate a switch with her head six times in a 30-minute session with verbal and physical prompting.  This does not demonstrate progress, as one year earlier, Student could activate a switch up to 11 times in a 20-minute session.  While the report

of her ability in May 2021 showed Student did not make consistent progress on this goal compared to the prior year, Student did not establish this was not an accurate statement of her present level of performance in this area.

In the areas of communication development, and receptive language, when asked a question about her care, Student could vocalize toward a speaker by moving her head toward her communication partner seated on her right side in seven out of 10 trials.  This is the same present level of performance as in May 2020.  While Student did not make consistent progress on this goal, compared to the prior year, Student did not establish this was not an accurate statement of her present level of performance at this task in May 2021.

Significantly, Student was beginning to respond two direct questions about her personal care and preferences by using either body language or facial expressions, smiles, or vocalizations and participating in they requested activity indicating a "yes" response, and turning her head away or moving her gaze to the side indicating a "no" response.  This was a newly emerging skill and demonstrated progress as of May 2021. Student did not establish that this was not an accurate statement of her present level of performance in this area.

In the area of gross motor skills, during physical therapy, Student could tolerate being in her gait trainer for 15 minutes at a time.  This does not demonstrate progress, as a year earlier, she could tolerate pre-gait activities between 15 to 25 minutes.  While it showed Student did not make progress on this goal, compared to the prior year, Student did not establish this was not an accurate statement of her present level of performance at this skill as of May 2021.

In the areas of social-emotional development, adaptive daily living, and vocational skills, Student was able to stay in contact with multisensory items placed in her hand for one to two minutes.  This demonstrated progress as Student now explored the tactile materials without pulling her hands toward her face in two out of three trials. She could respond to "are you ready" with a vocalization "ah," a giggle or a smile. Student did not establish this was not an accurate statement of her present level of performance at this skill in May 2021.

Student reportedly participated with classroom staff who moved her arms in passive range of motion before and in preparation for classroom activities.  Student did not establish this was not an accurate statement of her level of performance in this activity as of May 2021.  Student was beginning to respond to the question of if she was ready for a preferred activity by vocalizing, giggling, saying "ah," or smiling.  Student was vocalizing and smiling inconsistently to let others know she was ready for the requested activity, when she was allowed between 10 and 15 seconds to respond, and when the question was occasionally repeated.  Student did not establish this was not an accurate statement of her present level of performance at this task in May 2021.

Student did not meet her burden of proving the information Bellflower documented regarding her present levels of performance in May 2021 were not accurate.  Student's claim that there was overlap between the present levels of performance from May 2020 was not supported by other credible evidence or was explained by Student's generally low developmental level and low potential for significant progress.

### ISSUE 5B:  MEASUREABLE GOALS IN THE MAY 10, 2021 IEP

Student claimed the goals of her May 10, 2021 IEP were not measurable goals.

Bellflower asserts the goals were measurable.

An IEP must also include a statement of measurable annual goals, academic and functional goals designed to meet the needs of the student.  An IEP must also include a description of how the students' progress toward annual goals will be measured.  (Ed. Code, §56345, subds. (2), (3).)  The IEP team need not draft IEP goals in a manner that the parents find optimal, as long as the goals are objectively measurable.  (*Bridges*, *supra*.)

Goals are deemed measurable when they can be measured by grade level and accuracy level.  An IEP must include a statement of measurable, annual academic and functional goals designed to meet the needs of the student.  An IEP must also include a description of how the students' progress toward annual goals will be measured.  (Ed. Code, § 56345, subds. (a)(2), (3).)  Here, the IEP team developed seven goals in Student's unique areas of need.

On May 10, 2021, the IEP tam developed seven goals in Student's unique areas of need.

Student regressed in her functional academic skills requiring her to use a head switch during COVID-19 closures, because Parent did not agree to have the head switch sent home until January 2021, and did not attach the head switch onto Student's wheelchair, in spite of Bellflower providing therapies virtually.  Student's present level of performance reflected this regression.

Student's functional academics goal projected that when seated in an upright position with a head switch attached to a tablet on a mount within her central vision or sensory device, she would increase her ability to move her head from side to side and activate the switch 10 times in a 30-minute session in five out of five trials as measured

by the instructional plan and data collection.  Her present level of performance at this task in May 2021 was activating the switch six times in a 30-minute session.  This 2020 goal had been higher, aiming for Student to activate the switch program 15 times in a 30-minute session, in eight of 10 tries.

Although Student's functional academics goal was adjusted to her lower current level of performance, Student did not establish the functional academics goal was not objectively measurable.  The goal specified the number of times in a 30-minute session the observer and data collector must observe Student activating a switch.

Student's receptive communication goal projected that when engaging with a variety of peers or staff in various settings, Student would increase her ability to respond to a communication partner's greeting with a vocalization or a smile with 80 percent accuracy in five out of five trials.

Student did not establish the receptive communication goal was not objectively measurable.  The goal specified the number of times and opportunities the observer and data collector must observe Student turn toward a communication partner and vocalize her response to a greeting.

Student's gross motor goal projected that when positioned in her gait trainer, with seat supports and AFOs, Student would increase her ability to stand for 20 minutes, on four out of five trial days, as measured by the instructional plan and data collection. Although Student's 2020 IEP goal required her to use her stander with the support of an aide and a nurse, Student did not use her school stander during COVID-19 when she remained at home.  Parent finally allowed Bellflower to deliver Student's gait trainer in January 2021.

Although Student's gross motor goal was adjusted to her lower current level of ability, Student did not establish the gross motor goal was not objectively measurable. The goal specified the length of time and number of days the observer and data collector must observe Student standing in her gait trainer.

Student's new receptive language goal projected she would increase her communication skills and provide a yes or no response to direct questions about her personal care and preferences by using either body language, facial expressions, smiles, or vocalizations with 80 percent accuracy in five of five trials.

Student did not establish the receptive language goal was not objectively measurable. This new goal was based upon her newly emerging skill and was measurable because the goal specified the accuracy level and number of days the observer and data collector must observe Student using body language, facial expressions, or vocalizations.

Student's social-emotional goal projected she would sit upright and follow passive range of motion movements to both arms and participate in an exercise program by allowing the adult to assist without bringing her hands to her face on 10 trial days, as measured by the instructional plan and data collection.

Student did not establish the social-emotional goal was not objectively measurable. The goal specified the number of trial days the observer and data collector must observe Student participating in exercise without bringing her hands to her face.

Student's vocational skills goal projected that when asked if she was ready for a preferred activity or item, Student would respond by vocalizing, giggling, smiling, or saying "ah," 80 percent of the time, on five out of five trial days, as measured by data collection and staff observation. This new goal was based upon her new emerging skill

and was measurable because it specified the percentage of accuracy and number of days the observer and data collector must observe Student correctly responding to questions about her readiness for an activity with smiles, vocalizations, giggles, or the word "ah."  Student did not establish the vocational goal was not objectively measurable.

Student's adaptive daily living goal projected that when given tactile materials to represent an upcoming transition, such as feeding, changing, or transitioning to her stander, Student would maintain hand contact with the materials prior to and in preparation for the following activity when her hand was placed on the object in eight out of 10 trials throughout the school day, as measured by staff observation and data collection.  This goal was measurable because it described the number of trials the observer and data collector must observe Student maintaining contact with a tactile transition object.  Student did not establish the adaptive daily living goal was not objectively measurable.

### ISSUE 5C:  APPROPRIATE GOALS

Student did not establish the functional academics goal was not appropriate. Although Student's functional academics goal was adjusted to her lower current level of abilities in the target tasks, it addressed an important area of unique need.  It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the receptive communication goal was not appropriate. This new goal was based upon her new emerging skills and addressed an area of need. It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the gross motor goal was not appropriate.  Although Student's gross motor goal was adjusted to her lower current level of abilities in these tasks, it addressed an important area of unique need.  It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the receptive language goal was not appropriate.  This new goal was based upon her new emerging skill and addressed an important area of unique need.  It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the social-emotional goal was not appropriate.  It addressed an important area of unique need.  It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the vocational goal was not appropriate.  This new goal was based upon her new emerging skill and addressed an important area of unique need.  It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Student did not establish the adapted daily living goal was not appropriate.  This new goal was based upon her new emerging skill and addressed an important area of unique need.  It was based on Student's present levels of performance and offered a challenging set of objectives to be worked toward in the next 12 months.

Therefore, Student did not meet her burden of proof that the May 10, 2021 IEP failed to offer appropriate goals.

ISSUE 5D:  DID BELLFLOWER DENY STUDENT A FAPE IN THE MAY 10, 2021 IEP BY FAILING TO OFFER APPROPRIATE SERVICES?

Student contends Bellflower failed to offer appropriate services.

Bellflower asserts it offered appropriate services.

A child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.  (*Rowley*, *supra*, 458 U.S. 176, 201-204 [102 S. Ct. 3034]; *Endrew F., supra,* 580 U.S.  [137 S.Ct. 988, at p.1000].)

Parent did not consent to the triennial assessment plan and Bellflower conducted alternate forms of information gathering.

The triennial May 2021 IEP was held to review and revise Student's IEP and transition her to high school.  Bellflower offered:

- placement at Trident Special Classes specialized academic instruction, 360 minutes per day;
- language and speech therapy, 120 minutes per month individually; 120 minutes per month in a group;
- occupational therapy consultation, 60 minutes per month;
- adapted physical education,120 minutes per month in a group setting;
- physical therapy, 40 minutes per week individually;
- health and nursing specialized physical health care services, 270 minutes per day, for assisted bowel care, gastronomy tube feedings, oral feedings, positioning,

routine seizure care, medication, and assistance with applying and removing AFOs;

- health and nursing other services consultation 60 minutes per year;

- specialized vision services consultation, 30 minutes per month;

- a one-to-one aide, 360 minutes per day;

- physical therapy services, 160 minutes per month individually;

- transportation; and

- extended school year services.

Student provided no evidence Trident Special Classes was not an appropriate placement.  Trident Special Classes was Orange County Department of Education's high school program with nurses and related service providers on-site.  Student provided no expert testimony that the related services offered were not appropriate.

Rather, the evidence established that Bellflower's May 10, 2021 IEP offer was appropriate because it provided Student access to specialized instruction and related services individually designed to provide her educational benefit and reasonably calculated to enable her to make progress appropriate in light of her circumstances.  The specialized imbedded high school program and related services offered was appropriate.  The offer was commensurate with her previous Special Classes placement, levels of service, her present levels of performance and her goals.  As a further benefit, her service providers from Mann Special Classes would continue working with her at Trident Special Classes.

ISSUE 6:  DID BELLFLOWER DENY STUDENT A FAPE DURING THE 2021-2022 SCHOOL YEAR UP TO SEPTEMBER 24, 2021, BY FAILING TO IMPLEMENT STUDENT'S MAY 10, 2021 IEP BY NOT PROVIDING TRANSPORTATION WHICH INCLUDED A ONE-TO-ONE-AIDE, A WHEELCHAIR VAN, AND A DRIVER?

Student contends Bellflower failed to provide appropriate transportation for the first month of the 2021-2022 school year.

Bellflower alleges it provided timely and appropriate transportation and a qualified aide for Student.

A school district violates the IDEA if it materially fails to implement a child's IEP. The failure to implement the IEP is "material," when the services provided to a disabled child fall "significantly short of the services required by the child's IEP."  (*Van Duyn*, *supra*, 502 F.3d 811, 822**)**

Transportation is a related service, along with other developmental, corrective, and supportive services, which a student needs to benefit educationally.  (20 U.S.C. §1401(26)(A); Ed. Code, § 56363, subd. (a).)

A school district shall adopt transportation policies, where appropriate, and set forth the criteria for meeting the transportation needs of special education students. The policy shall include procedures to ensure compatibility between mobile seating devices, when used, and federal motor vehicle safety standards to ensure drivers are properly trained in the installation of mobile seating devices in the securement systems. (Ed. Code, § 56195.8, subds. (a), (b)(5).)

As a related service, "transportation" means travel to and from school and between schools, travel in and around school buildings, and specialized equipment, if it is required to provide transportation for a student with a disability, such as adapted buses, lifts, and ramps. (34 C.F.R. § 300.34(c)(16)(i)-(iii).)

The IDEA requires transportation of a disabled child only to address his educational needs, not to accommodate a parent's convenience or preference. (*Fick v. Sioux Falls School Dist. 49-5* (89th Cir. 2003) 337 F.3d 968, 970.)

Student completed her series of COVID-19 vaccinations, her doctor provided medical clearance, and she was ready to attend school beginning August 24, 2021, the first day of school of the 2021-2022 school year. Student requested a return to on-campus learning and transportation as provided for in her IEP.

Bellflower was responsible for Student's transportation. It had appropriate transportation arranged to begin on August 24, 2021. An appropriate, wheelchair-accessible transportation van with a one-to-one aide who wore a protective mask showed up at Student's driveway. However, Parent asked the aide if she was vaccinated, and the aide disclosed she was not vaccinated. Parent then refused to send Student on the van with the masked-but-unvaccinated aide, and Student did not attend school. Parent was notified on September 15, 2021, that another aide was available. Parent replied that Student had medical issues with her feet and would not be able to start until September 20, 2021. Parent did not consent to the transportation offered based on parent preferences for a vaccinated one-to-one-aide, when it is not required by the county or state public health departments, Bellflower, or Orange County Department of Education.

Student did not establish Bellflower failed to provide appropriate wheelchair accessible transportation with a one-to-one aide.

## CONCLUSIONS AND PREVAILING PARTY

As required by California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.

Issue 1:  Did Bellflower deny Student a FAPE, during the 2018-2019 school year and extended school year, beginning May 4, 2019, by failing to implement all parts of Student's IEP, known as an individualized education plan, while Student was medically unable to attend school?  Bellflower prevailed as to Issue 1 as to failing to implement the IEP as written, and as to Student's untimely challenge of home hospital instruction barred by the two-year statute of limitations.

Issue 2:  Did Bellflower deny Student a FAPE during the 2019-2020 school year for the COVID-19 distance learning beginning April 2020, by failing to implement all parts of Student's May 2018 and May 2019 IEP?  Student prevailed on Issue 2.

Issue 3:  Did Bellflower deny Student a FAPE at the May 2020 IEP by failing to provide sufficient information regarding Student's present level of performance and offer measurable and appropriate goals, and failing to offer appropriate in-person services at home?  Bellflower prevailed as to Issue (3)(A), (B), (C), and (D).

Issue 4: Did Bellflower deny Student a FAPE during the 2020-2021 school year, by failing to implement all parts of Student's IEP, including when in-person learning reopened, but Student could not medically attend?  Student prevailed as to Issue (4), from August 25 2020, to October 25, 2020.  Bellflower prevailed as to Issue (4),

beginning October 26, 2020, when school campuses re-opened to the end of the school year.  As to the procedural violation of not holding an IEP team meeting to discuss home hospital instruction, Bellflower prevailed.

Issue 5:  Did Bellflower deny Student a FAPE at the May 2021 IEP by failing to provide sufficient information regarding Student's present level of performance and offer measurable and appropriate goals, and failing to offer appropriate services?  Bellflower prevailed as to Issues (5)(A), (B), (C), and (D).

Issue 6:  Did Bellflower deny Student a FAPE during the 2021-2022 school year, up to September 24, 2021, by failing to implement Student's May 2021 IEP, by not providing transportation which included a one-to-one aide, a wheelchair van, and a driver? Bellflower prevailed on Issue 6.

## REMEDIES

Courts have broad equitable powers to remedy the failure of a school district to provide FAPE to a disabled child.  (20  U.S.C.  § 1415(i)(2)(C)(iii); see also, *School Committee of the Town of Burlington, Massachusetts v. Dept. of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996, 85 L.Ed.2d 385].)  This broad equitable authority extends to an ALJ who hears and decides a special education administrative due process matter.  (*Forest Grove School Dist. v. T.A* (2009) 557 U.S. 230, 244, n. 11 [129 S.Ct. 2484, 174 L.Ed.2d 168].)  An ALJ can award compensatory education as a form of equitable relief.  (*Park v. Anaheim Union High School Dist.,* 464 F.3d 1025, 1033.)

School districts may be ordered to provide compensatory education or additional services to a student who has been denied a FAPE.  (*Ibid.*; *Parents of Student W. v. Puyallup School Dist., No. 3* (9th Cir. 1994) 31 F.3d 1489, 1496.)  These are equitable remedies that courts may employ to craft "appropriate relief" for a party.  An award of

compensatory education need not provide a "day-for-day compensation." (*Id.* at p. 1497.) The conduct of both parties must be reviewed and considered to determine whether equitable relief is appropriate. (*Id.* at p. 1496.) Compensatory education is a prospective award of educational services designed to catch-up the student to where he should have been absent the denial of a FAPE. (*Brennan v. Regional School Dist. No. 1* (D. Conn. 2008) 531 F.Supp.2d 245, 265.) An award to compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs. (*Reid ex rel. Reid v. Dist. of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524.) The award must be fact-specific and "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Ibid.*)

An order requiring training of school district personnel can be an appropriate remedy to compensate a student for a school district's violations. (*Park v. Anaheim Union High School Dist., supra,* 464 F.3d at p. 1034 [student, who was denied a FAPE due to failure to properly implement his IEP, could most benefit by having his teacher appropriately trained to do so].

The prehearing conference order mandates that any party seeking reimbursement for expenditures shall present admissible evidence of these expenditures, or a stipulation to the amount of the expenditures. It further mandates that a party seeking compensatory education should provide evidence regarding the type, amount, duration, and need for any requested compensatory education. Finally, it requires that documents offered as evidence to support a request for reimbursement must be separated by a vendor.

Student established several violations of FAPE, Student, however, did not provide any expenditures, stipulations, or credible evidence regarding the type, amount,

duration, and need for any requested compensatory education.  Student did not establish an educational loss, because the evidence showed she made considerable progress on her goals.  Student may never develop beyond a seven-month-old level, as no evidence was presented what her potential could be.  Student had low abilities and low potential, and compensatory education may provide a modest benefit to Student.  Therefore, the ALJ who hears and decides a special education administrative due process matter has broad equitable authority.  (*Forest Grove School Dist. v. T.A* (2009) 557 U.S. 230, 244, n. 11 [129 S.Ct. 2484, 174 L.Ed.2d 168].)  An ALJ can award compensatory education as a form of equitable relief.  (*Park v. Anaheim Union High School Dist.,* 464 F.3d 1025, 1033.)

Student requested an order that transportation aide and a driver be provided to Student.  Student requests compensatory education in all areas of need, including 500 hours of academic instruction/educational therapy services, 575 hours of a one-to-one aide, 40 hours of speech and language therapy, 21 hours of occupational therapy, 11 hours of vision services, and three hours of physical therapy.  Student also requested attorney's fees.

As to Issue 2**,** Student established Bellflower failed to implement Student's IEP from April 1, 2020, to June 16, 2020.  However, Student did not provide evidence of the type, amount, duration, and need for compensatory education.  Student did not establish how long she could attend to tasks and whether she had sufficient attention and focus to work on her goals.

Student also benefited from the virtual program Bellflower provided.  While Student initially lost some skills, she regained those skills and developed higher skills.

The weight of the evidence supports an order for a generic and simple analysis of equitable remedies, considering the Student's low developmental level, multiple disabilities, and short attention span. Compensatory academic instruction is calculated at 30 minutes per day for eleven weeks, totaling 27.5 hours. Compensatory speech services are calculated at one hour per week for 11 weeks, totaling 11 hours. Compensatory physical therapy services are calculated at 40 minutes per week for eleven weeks, totaling seven and a half hours. Compensatory adaptive physical education services are calculated at 30 minutes per week for eleven weeks, totaling five and a half hours. Compensatory one-to-one services will be awarded to assist Student in accessing these services. Student did not request or establish that compensatory nursing services would be required. Transportation with an aide will be provided if the sessions are not conducted at Student's home.

As to Issue 4, Student established Bellflower failed to implement Student's IEP between August 25, 2020 and October 25, 2020. However, Student did not provide evidence of the type, amount, duration, and need for compensatory education. Student also benefited from the virtual program Bellflower provided. While Student initially lost some skills, she regained those skills and developed higher skills.

For this reason, a generic and simple analysis of equitable remedies is used. Student is entitled to compensatory services from August 25, 2020 to October 25, 2020 in the form of compensatory academic instruction is calculated at 30 minutes per day for nine weeks, totaling 22.5 hours. Compensatory speech services are calculated at one hour per week for nine weeks, totaling nine hours. Compensatory physical therapy services are calculated at 40 minutes per week for nine weeks, totaling six hours. Compensatory adaptive physical education/physical therapy services are calculated at 30 minutes per week for nine weeks, totaling four and a half hours. Compensatory

one-to-one aide services will be awarded to assist Student in accessing these services. Student did not request or establish that compensatory nursing services would be required.  Transportation will be provided if the sessions are not conducted at Student's home.  Student did not establish a denial of FAPE in the areas of vision consultation services or occupational therapy consultation services and compensatory services are not warranted.

## ORDER

1. Bellflower shall fund 50 hours of specialized academic instruction, 20 hours of speech and language therapy, 13.5 hours of physical therapy, and 10 hours of adaptive physical education/physical therapy, and 93.5 hours of one-to-one aide support to receive compensatory education services for Student by a certified non-public agency of Parent's choosing.  The duration and frequency shall be determined by the provider.  Bellflower shall also provide accessible transportation with an aide on the bus for these sessions if the services are not provided in Student's home.

2. Bellflower shall contract with the non-public agency selected by Parent within 45 days of Parent's notifying Bellflower in writing of the agency to provide the service.

3. Any compensatory service time awarded by this Decision must be used by March 13, 2024.  All unused hours remaining on March 14, 2024, shall be forfeited.

4. All other requests for relief are denied.

RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by it.  Pursuant to Education Code section 56505, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within 90 days of receipt.

*Deborah Myers Cregar*


Deborah Myers-Cregar

Administrative Law Judge

Office of Administrative Hearings